CITY OF LITTLE ROCK v. MORELAND.

5-1997 334 S. W. 2d 229

Opinion delivered April 4, 1960.

[Rehearing denied May 9, 1960]

*Spitzberg, Bonner, Mitchell & Hays,* for appellant.

*John W. Bailey* and *Moses, McClellan, Arnold, Owen & McDermott; By: Wayne W. Owen,* for appellee.

SAM ROBINSON, Associate Justice. In building a reservoir in connection with the city water supply system, the City of Little Rock acquired 15,000 acres of land west of the City. Of the property sought to be condemned, 1,300 acres belonged to the appellees, hereinafter referred to as the Morelands. To acquire the 1,300 acres the City filed condemnation proceedings. Upon a trial of the issues the City was allowed to condemn only 1,165.1 acres of the Moreland property, for which the owners were given judgment in the sum of $211,425,

which amounts to about $181 per acre. Both sides have appealed. The City contends that the amount of the judgment is excessive and that the entire 1,300 acres is needed for the reservoir. The Morelands contend that the amount of the judgment is not sufficient to pay full value for the land; that the property is worth at least $775,000 and, further, that the City does not need for the reservoir the 134 acres it seeks in addition to the 1,165.1 which the trial court held the City could take. On appeal there are three issues. First, the correct value of the land taken. Second, the date that should be considered in fixing the valuation. Third, the question of whether the City should be allowed to condemn the entire 1,300 acres, that is, the 134 acres in addition to the 1,165.1 allowed by the trial court.

Before any suit was filed, the parties entered into an agreement that, pending negotiations regarding the value of the land, the City could take possession of the property up to an elevation of 290 feet above sea level. It was further agreed that the City would file condemnation proceedings within thirty days after the time the Morelands might notify the City to file suit. The parties were unable to agree on the price, and the Morelands notified the City to commence the action within thirty days, as agreed upon. The City failed, however, to file the suit within the prescribed time, and the Morelands filed suit in the circuit court for damages. The City answered and cross complained, asking for condemnation of the 1,300 acres. The case was transferred to chancery court. Upon a trial there, the City was allowed to take only 1,165.1 acres and the Morelands were given judgment for $211,425. The above mentioned agreement between the parties whereby the City was given permission to take the land up to the 290 foot elevation, pending negotiations, contained a provision that in determining the valuation of the land such value should be the market value as of September 16, 1956.

The Moreland family has owned the property involved for many years, the present owners having inherited it. Prior to the time the City decided to con-

struct a reservoir on the property, the Morelands had suspected that the lands contained some kind of minerals or earth that might be of exceptional value. After the suit was filed, the Morelands obtained the services of a geologist and began a systematic examination of the land, including the subsoil, to a depth of about 45 feet in places. As the result of such tests, it was determined that a large part of the property consisted of what is known as bloating clay, which has considerable more value than ordinary dirt. The clay is used in making light-weight aggregate, which in turn is used in manufacturing concrete blocks and other concrete products.

The City contends that even assuming the bloating clay has an exceptional value, such value should not be considered in arriving at the value of the land because on September 16, 1956, the time fixed for the valuation, it had not been definitely established that the land contained bloating clay. The City points out that this Court has held many times that the date of the taking is the date to be considered in determining the value of the land. Actually, the land had just as much value at the time of the taking as it has had at any time since that date. Nothing has changed to give it any different valuation. True, facts have been developed since the taking that show the land's true value. But the value was there at the time of the taking, and the facts were fully developed before any valuation was agreed upon and before any court fixed such valuation. It would be a harsh rule to say that the State, or some subdivision thereof, or some private corporation, could take private property containing a deposit of diamonds and pay therefor the price of land having very little value because at the very moment of the taking it was not known that the diamonds were there. This problem has been before the courts three times. In each instance it was held, and we think correctly so, that the property owner could recover the actual value of the land. *City of Los Angeles* v. *Pomeroy*, 124 Cal. 597, 57 Pac. 585; *Tyson Creek Railroad Co.* v. *Empire Mill Co.*, 31 Idaho 580, 174 Pac. 1004; In re *Board of Water Supply*, 205 N. Y. S. 237.

For its next point the City contends that the land has a market value from a low of $43,831 to a high of $55,250, and the fact that the land contains bloating clay gives it no added value whatever. On the other hand, the Morelands contend that the bloating clay makes the property worth over a million dollars. Both sides have tried this case in a most able manner and it is hard to see how either side could have done anything that was not done in developing its side of the case. The record and exhibits are voluminous; it would be wholly impractical and would extend this opinion to an unreasonable length to here abstract all the evidence. The Morelands produced evidence to the effect that the land contains bloating clay, which makes it worth somewhere between $775,000 and $1,735,320. The City produced direct and circumstantial evidence to the effect that the clay adds no value to the land.

The evidence is rather conclusive that bloating clay is highly desirable in the manufacture of light-weight aggregate. The evidence produced by the Morelands shows that there is no plant in Pulaski County producing lightweight aggregate; that the material sells for $4.50 per ton at a plant at Memphis and the same price at Baton Rouge, Louisiana; that the freight on the material from those points to Little Rock just about doubles that price; it sells for $8.00 at Little Rock. And the evidence further tends to prove that it would be entirely practical and economical to build a plant in Pulaski County to use the Moreland clay in the manufacture of light-weight aggregate. On the other hand, the City produced evidence to the effect that a large part of the Moreland land is covered with scrub timber, which would have to be cleared; that lime concretions are found in the deposit to an average thickness of 11 feet; that all of the clay below the lime concretion zone is below the water table in a river bottom, with a large watershed upstream; that beneath the clay deposit the soil is such that it permits free movement of underground water; that the deposit is subject to periodic flooding by the Arkansas River: that Pulaski County contains enormous reserves of plastic clays, some of which have bloating qualities;

and that the Moreland clay is 20 to 25 miles from Little Rock. The City argues that these asserted facts render the Moreland bloating clay worthless as such, and, further, that by mixing coal with other plastic clays and then firing the mixture at a very high degree of heat such clays will bloat. But, on the other hand, it does not appear that the fact that part of the Moreland property overflows occasionally will seriously interfere with obtaining the clay. And, moreover, concrete blocks made of light-weight aggregate from the Moreland clay were manufactured and introduced in evidence. They show no signs of being affected by lime. There is evidence that there are deposits of the clay on Palarm Creek and White Oak Bayou in Pulaski County, but it is not shown whether such deposits are available for the manufacture of light-weight aggregate. According to the undisputed evidence, light-weight aggregate is used extensively in the building business. But the City argues that the available market in Pulaski County would not justify the development of the Moreland clay. There is, however, evidence to the contrary. Moreover, it does not appear that Little Rock would be the only available market for light-weight aggregate produced in Pulaski County. If the material produced in Baton Rouge and Memphis can be sold in Little Rock, the inference is that the same material produced here could be sold at a distance from this locality. There is certainly no evidence to the contrary.

With regard to other bloating clay that may be found in the county, it will be recalled that the Morelands were allowed about $181 per acre for their land. According to the undisputed evidence, bloating clay is a sedimentary deposit found in alluvial lands. Usually alluvial lands are the best farm lands, and there is no substantial evidence in the record that alluvial lands in Pulaski County that might contain the sedimentary deposit known as bloating clay can be purchased for as little as $181 per acre. It is a matter of common knowledge that much of the alluvial land in this State made by deposits from the Arkansas and Mississippi Rivers sells for a much higher price. All in all, we cannot say

the amount of the judgment is contrary to a preponderance of the evidence.

Next we come to the question of whether the City should be allowed to condemn the 134 acres in addition to the 1,165.1 acres allowed by the chancery court. We think the City has a right to condemn the entire 1,300 acres. The Morelands contend that the 134 acres in question are not absolutely necessary in establishing the reservoir and that according to such cases as *Selle* v. *City of Fayetteville,* 207 Ark. 966, 184 S. W. 2d 58, the land must be absolutely necessary to the project before condemnation will be decreed. Here the preponderance of the evidence proves that the City needs this 134 acres for three reasons: First, it will enable the City to run straight lines in establishing the boundary of the property; this will greatly facilitate the identification of the boundary line and the legal description. Second, if the boundary follows a contour line it would require the services of an engineer to tell if anyone were trespassing. Third, it is very important to maintain sanitary conditions in the watershed of the reservoir insofar as it is possible to do so. All the 1,300 acres are in the watershed except about 9 acres that are required to square up some corners.

In the circumstances we believe it can fairly be said that it is absolutely necessary for the City to have the entire 1,300 acres. Of course, the value of the 134 acres was not included in the judgment rendered. There is no bloating clay under the 134 acres and according to the preponderance of the evidence this particular 134 acres is worth $4,725. The decree of the chancery court must be amended to permit the City to condemn the 134 acres in addition to the 1,165.1, and the amount of the judgment must be increased by the sum of $4,725, making a total judgment of $216,150. As modified the decree is affirmed.

George Rose Smith, J., dissenting. The situation in this case is rather like that considered in *Hoy* v. *Kansas Turnpike Authority,* 184 Kan. 70, 334 P. 2d 315. That was an eminent domain proceeding involving land that con-

tained extensive deposits of stone suitable for commercial use. The court observed, however, that the eastern third of the state was underlaid with rock, and in view of this fact the opinion stressed the point that the abstract value of the stone was not to be considered independently and without regard to its effect upon the market value of the land. In the language of the court: "While the owner should be given by way of compensation for his land its fair market value for any use for which it has a commercial value in the immediate present or which may reasonably be anticipated in the near future, the uses which may be considered *must be so reasonably probable as to have an effect on the present market value of the land.*"

In the case at bar the greater part of the Morelands' proof was directed toward showing (a) that their land contains deposits of commercially usable bloating clay and (b) the extent of those deposits. This presents the basic factual situation of the *Hoy* case, that the land contains a mineral for which there is a market. The Morelands had the burden of carrying their proof one step farther, by showing to what extent the market value of their land was enhanced by the presence of the clay. It is on this point that I think the weight of the evidence to be decidedly in favor of the appellant.

On this issue the testimony offered by the landowners lacks persuasiveness. Their principal witnesses were geologists. These men were qualified to test the clay and determine its bloating characteristics, but they had no real knowledge of matters that would be considered by a prospective purchaser of the Moreland deposits, such as the cost of building a light-weight aggregate plant, fuel costs. transportation costs, the actual demand for lightweight aggregate in the Little Rock area, etc. Some of these witnesses valued the Moreland clay at more than a million dollars; but their estimates were naked figures, conjured up without supporting reasons, and might equally well have been either multiplied or divided by ten.

The city met the issue squarely and introduced testimony that I find convincing. Among its witnesses were men with practical experience in the business of making

lightweight aggregate material and in the construction of plants for that purpose. The witness Willson, for example, is an engineering officer for Texas Industries, Inc., which has plants in eight states and is the world's largest producer of one type of lightweight aggregate. Willson was intimately familiar with the problems involved in constructing and operating such plants; he had actually designed and assisted in the construction of three of them. He and other equally well qualified witnesses, all wholly disinterested, had made a careful survey of the many factors affecting the market value of the appellees' deposits of bloating clay. It was their informed opinion, supported by cogent reasons based upon practical knowledge and experience in the industry, that the existence of the clay did not substantially increase the market value of the Moreland lands.

The testimony is too extensive to be detailed, but one point established by the city may be mentioned. According to the undisputed testimony of Willson and other witnesses there are two methods of producing lightweight aggregate. In one, bloating clay is subjected to extreme heat, which causes the clay to expand and become a light, porous material. In the other, pulverized coal is first mixed with a non-bloating plastic clay. The coal is then burned away, leaving a light, porous material. The final product of the two methods is exactly the same. Neither process has any particular advantage over the other; in fact, Texas Industries, Inc., uses one process at some of its plants and the other process at other plants.

Although the known deposits of bloating clay in Arkansas are few there is an abundance of plastic clay suitable for the production of lightweight aggregate. Indeed, this plastic clay is about as common as the stone in the *Hoy* case. I find no reason to doubt the conclusion of the city's expert witnesses, that a company erecting a lightweight aggregate plant in the Little Rock area would not pay an inflated price for the Moreland bloating clay when unlimited quantities of the equally satisfactory plastic clay could be obtained for the price of the land valued for agricultural purposes. This is a chancery case, and in my

opinion the award is contrary to the preponderance of the evidence. I therefore dissent.