[No. D016677. Fourth Dist., Div. One. Sept. 29, 1993.]

SAN DIEGO COUNTY WATER AUTHORITY, Plaintiff and Appellant,
v.
JOHN MIREITER et al., Defendants and Respondents.

## COUNSEL

Jennings, Engstrand & Henrikson and Bruce W. Beach for Plaintiff and Appellant.

Endeman, Lincoln, Turek & Heater, Ronald L. Endeman, Donald R. Lincoln and Linda B. Reick for Defendants and Respondents.

## OPINION

**WIENER, Acting P. J.**—In eminent domain cases, the "date of valuation" generally precedes the date of trial at which the value of the property is

determined. The question here is whether a jury, in determining the amount of compensation due the property owner, is required to consider facts discovered during this lag which tend to reduce the property's fair market value. We conclude that the language of Code of Civil Procedure section 1263.320, which defines "fair market value" as "the highest price on the date of valuation that would be agreed to by a seller . . . and a buyer . . . each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available," necessarily implies such facts must be taken into account. Accordingly, because the jury here was not properly instructed with respect to such facts, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants John and Maria Mireiter, Joseph and Lee Mireiter, and Josef and Adelheid Bauer owned a rectangular piece of undeveloped property consisting of 7.38 acres located in the City of San Marcos. Studies in 1979 and 1986 had identified four "vernal pools" located on the property. Vernal pools are temporary ponds of water, varying in size and duration, which form during the rainy season and disappear in the summer. They are associated with various species of plants and animals, some of which are endangered and some of which are found only in San Diego County.

To facilitate the construction of a water pipeline, plaintiff San Diego County Water Authority (the Authority) filed this action in 1990 seeking condemnation of a 100-foot-wide strip totaling 1.64 acres running through the middle of the property owned by defendants. This left 2 "remainders," a northern parcel totaling 2.58 acres and a southern parcel consisting of 3.16 acres. In June 1990 the Authority deposited $286,743 with the court as the probable amount of compensation. Pursuant to Code of Civil Procedure section 1263.110, this deposit established June 29, 1990, as the date of value for the purpose of awarding compensation. The Authority took possession of the property a month later by virtue of an order entered pursuant to Code of Civil Procedure section 1255.460. Trial was set for January 1992, with the only issue being the amount of compensation to be paid.

In May 1991 a biologist inspecting the property located several new vernal pools not previously identified in the 1979 and 1986 reports. The Authority contended that the effect of this new discovery was to reduce the value of the condemned property—and in turn the amount of compensation due—because the existence of more vernal pools would make development of the property more difficult. Defendants unsuccessfully sought to exclude

evidence of the subsequently discovered vernal pools but the trial court then curiously rejected instructions sought by the Authority which would have required the jury to consider the effect of the new vernal pools on the property's value. Instead, the jury was instructed that the postvaluation date discoveries were relevant only to the extent that the possibility of such discoveries would have been considered by a buyer and seller and thus reflected in the market price as of the valuation date: "In determining fair market value you may consider discoveries regarding the physical condition of the property which were made after the date of valuation if you find a reasonable buyer and seller would have taken the probability of such conditions into account in fixing the selling price."

The jury then returned a verdict, finding that the market value of the property was slightly more than $457,000 and that the condemnation resulted in severance damages of over $263,000, for a total award in excess of $720,000.

DISCUSSION

I

■ The central issue in this case is whether the court erred in instructing the jury regarding the effect of information about the condemned property discovered after the valuation date which tended to reduce the property's value. Specifically, the Authority contends the court was obligated to instruct the jury it *must* consider the May 1991 discovery of two additional vernal pools in assessing the compensation to be paid to defendants.

Perhaps the most oft-cited case on after-acquired information as it affects value in condemnation proceedings was decided by the California Supreme Court in 1899. In *City of Los Angeles* v. *Pomeroy* (1899) 124 Cal. 597 [57 P. 585], the city sought to condemn 315 acres in the San Fernando Valley for the purposes of constructing a tunnel project to maintain and enhance the city's water supply system. (*Id.* at pp. 604-607.) Apparently, information discovered after the date of summons (the valuation date for the purposes of the case) indicated the volume and hence the value of the subterranean water flow was greater than previously assumed. The trial court instructed the jury as follows: " 'Although you may believe from the evidence that by reason of things done, discovered, or ascertained since June 27, 1893, it now appears that the land was then more valuable for any purpose or use than it was then known to be; yet you cannot consider such additional value unless you believe also that these things were sufficiently known or obvious in June,

1893, to affect the market value at that time, and did so affect it.' " (*Id.* at p. 642 (lead opn. of Beatty, J.).)

What appears to be the lead opinion in the case, a 43-page tome, was authored by Chief Justice Beatty. In it he argues that the giving of such an instruction was error: "In several of these instructions the jury are told in effect that in estimating the value of these lands they must not take into consideration any fact discovered since the summons was issued. In other words, to use the illustration put by appellants, if a gold mine worth millions of dollars had been discovered in [the] land the day after the issuance of summons, the city could take the land by paying its value for agricultural purposes.

"This conclusion, it is true, follows logically from the proposition that market value at the date of the summons is to control, and that is the idea upon which the instructions are based. But I think this is a mistaken idea. The thing to be ascertained is not market value, but actual value (Code Civ. Proc., sec. 1249), and the only reason why market value is taken as the criterion of compensation in ordinary cases is because it is in such cases the true measure of actual value—the only practical test. But in a case where discoveries made after the issuance of summons demonstrate that the actual intrinsic value of the land at that date was greater than its market value—in other words, when it appears that market value is no criterion of actual value—those discoveries should be taken into consideration. As such discoveries were claimed in this case, I think the court erred in giving and refusing the instructions referred to." (124 Cal. at p. 644 (lead opn. of Beatty, J.).) The Chief Justice's opinion has been frequently cited, apparently as the opinion of the court, in support of a "hindsight" rule requiring consideration of facts discovered after the date of valuation which affect the value of the property. (See, e.g., *City of Little Rock* v. *Moreland* (1960) 231 Ark. 996 [334 S.W.2d 229, 230-231]; 4 Nichols on Eminent Domain (3d ed. rev. 1989) § 12A.07[1]; Orgel, Valuation Under the Law of Eminent Domain (2d ed. 1953) § 27, p. 133; Jahr, Law of Eminent Domain—Valuation and Procedure (1953) p. 110.)

The concurring opinion of Justice Temple follows the Chief Justice's opinion. Close examination, however, reveals that Justice Temple's opinion was joined in by four other justices, thus making it a majority opinion as to those points on which Justice Temple and the Chief Justice disagree.[1] The first of those points, according to Justice Temple, "has regard to the time

---

[1]With regard to a different issue, the confusion in the structure of the *Pomeroy* decision was noted by the Supreme Court in *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199 [123 Cal.Rptr. 1, 537 P.2d 1250]: "Confusion over this holding may result from the manner in which *Pomeroy* is reported. The initial opinion, written by Beatty, C. J., . . . is

when the property is to be valued." He goes on to dispute Chief Justice Beatty's asserted distinction between "actual value" (the then-existing statutory standard) and "market value":

"It is said if a gold mine worth millions of dollars had been discovered in this land the day after summons was issued, the city could take the land by paying its value for agricultural purposes.

"The supposition is an impossible one. A gold mine of the known actual value of millions could not be so discovered. The phrase 'actual value' is here used in opposition to the phrase 'market value.' It is difficult to give any meaning to it when so used, but in regard to a gold mine it must have reference to the amount which could be taken out of it over and above the cost of extraction. This could not be known until the mine was worked out, and therefore whenever it was valued necessarily the value could not be the actual intrinsic value, as defined, but would necessarily be its market value. So the proposed value only changes the statutory date at which the right of the city is deemed to accrue, and when the value is to be estimated. It is contended that the right must be deemed to have accrued and the valuation be made after other elements of value have been discovered.

"The phrase 'actual value' is sometimes used in contradistinction to market value to indicate that property is valued too high to make it a good investment. If the market value of the land was one hundred dollars per acre, it would not be permissible to show that the real or actual value was less and that the market value was inflated. The owner could get the market value and less would not make him whole. The government can take private property for its uses at any time conditioned only that the public shall compensate the owner, that it shall pay what it is worth when taken. This value must be the market or exchange value, for there can be no other. Value, which determines the price at which the owner must sell, must be the exchange or market value, and actual value means actual market value." (*City of Los Angeles* v. *Pomeroy, supra,* 124 Cal. at pp. 648-649 (conc. opn. of Temple, J.).)

Focusing solely on the quoted portion of Justice Temple's analysis, it is not entirely clear whether he is disagreeing with the result Chief Justice Beatty would reach (information discovered after the date of valuation should be considered) or only with the form of the analysis (the evidence should be considered because the statutory concept of "actual value" is

superseded by the concurring opinion of Temple, J., with whom four other members of the court joined . . . ." (*Id.* at p. 211, fn. 3.)

different from market value).[2] Certainly, Justice Temple makes a persuasive case for the proposition that there is no such thing as "actual value" in any absolute sense. What the Chief Justice was arguing for is a market value standard where the facts upon which the valuation is based may be augmented by information discovered after the date of valuation. The real question before the court in *Pomeroy* was whether the phrase "actual value" as used in the relevant statute indicated a legislative intent that later-discovered information could be taken into account in assessing market value.

The statute before the court in *Pomeroy* is not the same as that which governs the decision in this case. "Actual value" of the condemned property is no longer the issue. Instead, Code of Civil Procedure section 1263.310 now provides that the measure of compensation "is the fair market value of the property taken." Section 1263.320 defines "fair market value" as "the highest price on the date of valuation that would be agreed to by a seller . . . and a buyer . . . each dealing with the other *with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available.*" (Italics added.) We read the highlighted language to reflect a legislative intent that all information known at the time of trial be considered to the extent relevant to establish the market value on the date of valuation. Thus, while evidence of a change in the condition of the property after the date of valuation may not be admissible (see *post*, fn. 5), information about the condition of the property on the date of valuation which happens to be discovered after that date must be considered. In effect, the parties are presumed to know all relevant information available at the time of trial, even if it could not reasonably have been discovered until after the date of valuation.[3]

Few cases other than *Pomeroy* have addressed the question whether evidence discovered after the date of valuation should be considered in

[2] The introductory sentence of Justice Temple's opinion explains that he concurs in the Chief Justice Beatty's opinion "except as to that part of the opinion in which certain rulings made by the trial court are declared erroneous." (*City of Los Angeles* v. *Pomeroy, supra*, 124 Cal. at p. 647 (conc. opn. of Temple, J.).) This would seem to indicate a disagreement with result as well as reasoning.

[3] The theory underlying this rule is not unlike the approach adopted by the California Supreme Court and other courts in defining a defective product. Under the "hindsight" approach articulated in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], a product is defective even if the defect could not have been discovered at the time the product was manufactured. (*Id.* at pp. 430, 434; see also, e.g., *Phillips* v. *Kimwood Machine Co.* (1974) 269 Ore. 485 [525 P.2d 1033, 1036]; Keeton, *Products Liability—Inadequacy of Information* (1970) 48 Tex.L.Rev. 398, 403-404.) Although the question is whether the product was defective when sold, the question of defectiveness is measured by the state of knowledge at the time of trial. Similarly in this case, the question is the value of the property as of the valuation date, but that value is assessed given the state of knowledge at trial.

determining the value of the condemned property. Those which do, however, reach the consistent conclusion that the newly discovered facts must be taken into account.

In *Tyson Creek R. Co.* v. *Empire Mill Co.* (1918) 31 Idaho 580 [174 P. 1004], the court confronted a case similar to the hypothetical posed in *Pomeroy*. Gold deposits were discovered on a parcel of condemned property after the issuance of summons (the date of valuation). After quoting the opinions of both Chief Justice Beatty and Justice Temple, the court continued: "The correct rule may be deduced from the foregoing discussions. Actual value is market value when the true conditions are fully disclosed. . . . The gold, the presence of which was disclosed by prospecting after summons was served, was in the ground at and prior to that date. It was and is the property of appellants, and if it is in quantity and condition to be profitably mined, they were entitled to show that fact, in order to obtain just compensation for any damage they may have suffered by reason of interference by respondent in the use and enjoyment of their lands for mining purposes, although its actual condition was discovered after summons was served upon them. In this view of the law that portion of the instruction . . . which charges that the jury should not consider any increased value by reason of any alleged discoveries . . . after the date of issuance of the summons, is misleading and erroneous." (*Id.* at p. 1006.)

Also illustrative is the decision of the Arkansas Supreme Court in *City of Little Rock* v. *Moreland, supra,* 334 S.W.2d 229, where deposits of "bloating clay" were discovered between the commencement of condemnation proceedings and the time of trial. The court addressed the city's argument as follows: "The city contends that even assuming the bloating clay has an exceptional value, such value should not be considered in arriving at the value of the land because on September 16, 1956, the time fixed for valuation, it had not been definitely established that the land contained bloating clay. The city points out that this Court has held many times that the date of the taking is the date to be considered in determining the value of the land. Actually, the land had just as much value at the time of the taking as it has had at any time since that date. Nothing has changed to give it any different valuation. True, facts have been developed since the taking that show the land's true value. But the value was there at the time of the taking, and the facts were fully developed before any valuation was agreed upon and before any court fixed such valuation. It would be a harsh rule to say that the State, or some subdivision thereof, or some private corporation, could take private property containing a deposit of diamonds and pay therefor the price of land having very little value because at the very moment of the taking it was not known that the diamonds were there." (*Id.* at p. 230; accord, *In re*

*Board of Water Supply of City of New York* (N.Y. App. Div. 1924) 209 A.D. 231 [205 N.Y.S. 237-238]; *Huie* v. *Campbell* (N.Y. App. Div. 1953) 281 A.D. 275 [121 N.Y.S.2d 86, 87].)

We are unaware of any decisions which directly address the question whether information discovered after the valuation date which tends to *lessen* the value as of the valuation date should be considered in determining the amount of compensation due the property owner.[4] Several treatises in the area have considered the issue, however, and reach the consistent conclusion that a "hindsight" approach works in favor of the condemning agency as well as the property owner. Perhaps the preeminent commentary on the law of eminent domain explains: "Because some period of time must elapse under our forms of procedure between the date as of which the valuation must be made and the date when the valuation process is actually applied, the trier of fact often finds itself confronted with information affecting value which was latent or unknown at the time of the taking. The difficulty experienced in the handling of such information has stemmed from the use of the 'market value' concept as an end in itself, rather than as a means to an end. Used as an end in itself, it obviously follows that since such knowledge was unknown at the date of the taking, it could have no influence one way or the other upon the market value on that date.

"However, rules relating to the fixing of damages merely afford convenient measures of value that are ordinarily satisfactory and conclusive. They are, nevertheless, nothing more than a means to an end and that end is complete indemnity. Therefore, if appropriated land contains a valuable deposit, which is unknown at the time of the taking but discovered prior to the time when just compensation is determined, the owner (in order to be indemnified for the thing taken), must have the value of the deposit included in a reckoning of his award. *In line with this view, it has been held that events that occur prior to the actual divestiture of title may be availed of to the*

---

[4]In support of their argument defendants cite *Firestone Tire & Rubber Co.* v. *County of Monterey* (1990) 223 Cal.App.3d 382 [272 Cal.Rptr. 745], a property tax assessment case. In *Firestone* the court upheld an assessor's valuation of a piece of commercial property for the 1980 tax year which failed to account for toxic waste contamination which the taxpayer claimed was present on the property in 1980 but not discovered until at least one year later. The court was careful to point out that the taxpayer's offer of proof as to contamination was not evidence. Indeed the assessor claimed "it had not been established that the contamination existed on the lien date in 1980."

In any event, *Firestone* and its tax assessment context, in our view, present a far different issue. Clearly, it is impractical to permit property owners to seek refunds or allow local governments to issue supplemental tax bills whenever facts are discovered showing the property was worth more or less than previously thought. Each party should be limited to seeking a change in the following tax year. Where eminent domain proceedings are concerned, however, we are not dealing with an annual process which can be corrected in the following year. It is thus of greater importance that all facts known at the time of trial be considered in assessing the value of the property.

*detriment of the owner, where such facts show a reduction in the value."* (4 Nichols on Eminent Domain, *op. cit. supra*, § 12A.07[1], fns. omitted, italics added.) Other commentaries are in accord. (See Orgel, Valuation Under the Law of Eminent Domain, *op. cit. supra*, § 27, p. 136 ["[I]n some instances, the courts have employed hindsight to diminish rather than to enhance the compensation paid to the owner."]; Jahr, Law of Eminent Domain—Valuation and Procedure, *op. cit. supra*, pp. 110-111 ["Hindsight, however, is not always in favor of the condemnee."].)[5]

As another court has noted in a different context, "[T]he constitutional requirement for the payment of 'just compensation' is not only for the benefit of the landowner, but also for the benefit of the public. [Citation.] A landowner is not entitled to be placed in a better position financially than he was before the condemnation; neither is the state required to pay more than land is worth merely because of some theoretical, intangible concept." (*City of Fresno* v. *Cloud* (1972) 26 Cal.App.3d 113, 123 [102 Cal.Rptr. 874].) Here, discoveries after the valuation date demonstrated that the property's value was less than previously thought. Just as the landowner should not be shortchanged, the public should not be burdened with paying a king's ransom for a squire. The California statutory scheme and the overwhelming weight of authority supports the conclusion that relevant factual discoveries up to and including the date of trial must be taken into account, regardless of whether they inflate or deflate the value of the property. Accordingly, the

---

[5]To support the assertion that hindsight evidence can reduce rather than increase compensation, the commentaries cite but a single New York case which involves a situation somewhat different from the one we confront here. In *In re Hudson River Toll Bridge* (N.Y.Sup.Ct. 1913) 81 Misc. 324 [142 N.Y.S. 949], the state sought to condemn a bridge which was damaged by a flood after an award of compensation was made but before it was confirmed by the court and approved by the two affected counties. A motion to set aside the award was made after confirmation but before the second county had given its approval. The court set aside the award and ordered a new appraisal, holding that because formal title had not passed to the state, the risk of loss remained with the private owners of the bridge and a reduction in the amount of the award was appropriate. (*Id.* at pp. 951-952; cf. *Redevelopment Agency* v. *Maxwell* (1961) 193 Cal.App.2d 414 [14 Cal.Rptr. 170, 89 A.L.R.2d 1070] [suggesting that the condemning agency bore the risk of loss if either title *or* possession had been transferred].)

While the *Hudson River* case is superficially supportive of our conclusion that a hindsight approach must be applied to reduce as well as increase compensation, we believe in reality it addresses a different issue. As we have pointed out (*ante*, p. 1814), we deal here not with a postvaluation *change* in the condition of the property. Instead, we are concerned merely with the postvaluation discovery of information about the condition of the property *on the valuation date.* We believe the distinction is significant, for whatever the rule is regarding postvaluation *changes* in the property and the effect of a transfer of possession or title, the present language of Code of Civil Procedure section 1263.320 and the virtually unanimous view of courts and commentators compels a conclusion that the compensation due the landowner is the fair market value of the property as it would have been augmented by any information discovered between the valuation date and the date of trial.

trial court erred in failing to instruct the jury it was required to consider the newly discovered information in determining the compensation due defendants, and reversal is therefore required.

## II

For the benefit of the court on retrial, we comment briefly on one additional issue raised by the Authority. Defendants' appraisal expert, Thomas Roberts, testified that in arriving at a value for the property, he divided it into three "areas" or "zones"—a buildable zone, the unbuildable environmentally sensitive area containing the vernal pools, and an essentially unusable buffer zone between the two. Each area was valued by reference to a separate set of comparable property sales. Relying on *San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889 [63 Cal.Rptr. 640], the Authority argues that Roberts improperly "valued in terms of money each separate area and treated the total as the market value of the whole." (*Id.* at p. 901.)

As we read *Sweet*, it stands for the relatively unremarkable proposition that where different parts of a single parcel are adaptable to different uses, they may contribute differently to the total value of the parcel. Nonetheless, it is the entire parcel which must be valued. Thus, it is generally inappropriate to treat the single parcel as merely the aggregate of a number of separate pieces because each has an impact on the others which may either increase or decrease the value. *Sweet* appropriately concludes that the interrelationship among the pieces must be considered in any appraisal of the entire parcel.

Here, the record is unclear on the extent to which Roberts took into account the interrelationship among the three "areas" or "zones" in assessing the value of the entire parcel. Given the need to consider the newly discovered vernal pools in a second trial, the expert appraisal testimony will undoubtedly be different. We therefore simply indicate that to the extent any appraiser utilizes a "zone of value" approach, the interrelationship among the zones must be considered in determining a single value for the single piece of condemned property.[6]

---

[6]In a similar vein, the Authority argues that the comparable property sales used by Roberts to value the respective zones should have been rejected by the court because they were comparable in size to the zone but not to the entire parcel. We think the Authority argues for far too inflexible a rule. Although perhaps ideal, it is probably impossible to find any significant number of comparable sales involving land containing the same combination of

## Disposition

Judgment reversed. Pursuant to Code of Civil Procedure section 1268.720, defendants shall recover their costs for this appeal.

Work, J., and Todd, J., concurred.

Respondents' petition for review by the Supreme Court was denied January 13, 1994. Arabian, J., was of the opinion that the petition should be granted.

---

buildable and environmentally sensitive property. Lacking such ideal comparisons, the trial court must be permitted wide discretion in determining whether an allegedly comparable sale "sheds light" on the value of the land in question. (See *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 678 [312 P.2d 680].) As long as the appraiser takes into account the interrelationship among the "zones of value" he or she identifies, we see no absolute objection to the appraiser's consideration of property sales where the size of the parcel is comparable to size of the relevant "zone."