283 N.J. Super. 588 (1995)
662 A.2d 1020
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-APPELLANT,
v.
ROBERT J. SHEIN, MINDA SHEIN, MICHAEL SENOFF AND JANE SENOFF, DEFENDANTS-RESPONDENTS, AND STATE OF NEW JERSEY; JACK BORRUS; ESHAM CORP., A DEFUNCT CORPORATION OF NEW JERSEY; TOWNSHIP OF NORTH BRUNSWICK, IN THE COUNTY OF MIDDLESEX, A MUNICIPAL CORPORATION IN NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 1995.
Decided August 11, 1995.
*590 Before KING,[1] D'ANNUNZIO and EICHEN, JJ.
George P. Ljutich argued the cause for appellant (Deborah T. Poritz, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Mr. Ljutich, Deputy Attorney General, on the brief).
David B. Rubin argued the cause for respondents (Rubin, Rubin, Kaplan & Kuhn, attorneys; Mr. Rubin, on the brief).
The opinion of the court was delivered by EICHEN, J.S.C. (temporarily assigned).
This is a condemnation case in which the dispute focuses on the question of just compensation for property taken by the State of New Jersey, Department of Transportation (the State), under its eminent domain powers. The main issue presented involves the *591 interpretation of the term fair market value in determining just compensation in circumstances where the actual condition of the property, alleged here to be freshwater wetlands, was unknown to either the State or the owners on the date of valuation.
Prior to trial, the owners sought to bar, as irrelevant, evidence of the property's status as freshwater wetlands because, they argued, a reasonable buyer could not have been expected to know its condition on the date of valuation. The State cross-moved in limine to exclude the owners' appraisal and all resulting valuation testimony because the appraiser had not valued the property in its actual physical condition as freshwater wetlands.
The trial judge denied both applications reasoning that the jury should be allowed to determine whether a reasonable buyer and seller would have investigated the condition of the property to determine whether it was wetlands. Thus, the pivotal issue at trial upon which the jury was allowed to base its determination of just compensation was whether the owners could reasonably have discovered the alleged wetlands' condition of the property at the date of valuation. For the most part, the evidence presented at trial assumed the property was actually freshwater wetlands. The owners did not present an expert to contradict the State's expert's opinion that the property was wetlands; instead, they used cross-examination in an attempt to undermine the credibility of that opinion. The jury returned a favorable verdict to the owners of $250,000.
We conclude the judge erred in focusing the factual issue on whether a reasonable buyer and seller would have known that the property was wetlands. We are satisfied that a fair and just compensation award had to have been based on the actual condition of the property. Fair market value, by necessity, must depend upon the actual condition of the property, not what a reasonable person would know about the property. We reverse.

I.
Some discussion of the background of the case is helpful in understanding how this dispute arose and our resolution of it. In *592 September 1989, the State condemned 0.66 of an acre of a 6.02 acre tract of wooded, vacant land owned by defendants located at the intersection of southbound Route 1 and Aaron Road in the Township of North Brunswick, Middlesex County. The condemned property consisted of an irregularly shaped strip between 7 and 107 feet wide, along 864 feet of the property's existing frontage along Route 1, the existing jughandle and Aaron Road. The State also took a slope easement between one and five feet in width amounting to 0.33 of an acre.
On November 27, 1989, the State filed a complaint to condemn the property for the purpose of redesigning and enlarging the jughandle and for widening of Aaron Road. The State determined that $132,000 was just compensation for the condemned property and deposited that amount with the Clerk of the Superior Court on filing of the complaint. The estimated fair compensation for the taking was based on a report prepared by the State's appraiser, Joseph Martin, MAI, for K. Hovnanian Corporation, a well-known real estate development company. The owners did not challenge the taking but disputed the State's valuation. As a result, a panel of commissioners was appointed to value the condemned property. On April 2, 1992, prior to the commissioners' hearing, the State for the first time learned that the property might be eligible for regulation under the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, and engaged an environmental scientist, Amy Greene, to conduct a wetlands evaluation.
Greene, an environmental scientist for twenty years, testified that she delineated the property as wetlands based on "National Wetland Inventories" prepared by the United States Fish and Wildlife Service which were published in 1979 and prepared from aerial photographs taken in the mid-1970's. She also testified that she reviewed wetlands maps published by the Department of Environmental Protection in 1991 based on aerial photographs taken in 1986. In addition, she testified her opinion was based on "county soil surveys," prepared from analyses of aerial photographs published in 1987, as well as information obtained by *593 experienced soil scientists' "walking the property." From all of these she concluded that the entire tract is freshwater wetlands.
The owners presented no evidence at trial to rebut this testimony. As noted, the focus of their effort was to attempt to show that reasonable parties negotiating at arms length to purchase the property in 1989, the date of valuation, could not reasonably have been expected to know the property was wetlands. To support its contention, the owners introduced a letter to them from K. Hovnanian Corporation, dated October 24, 1988, offering to buy the condemned portion of the tract for $145,200.
As a result of Greene's report, the State revised its valuation of the land from $200,000 per acre to $70,000 per acre and changed its estimate of compensation for the taking to $48,300.
At trial, Martin defined market value as follows:
It means the highest price that a property would bring if exposed in the open market between a buyer willing to buy it and a seller willing to sell it, both parties having full knowledge of all the uses to which the property can be put and/or used; and neither buyer nor seller being compelled to buy and/or to sell. In other words, it's supposed to be a knowledgeable transaction between two willing parties who have equal capacity.
Martin opined that "a normal purchaser of almost any parcel of land in this day and age, and even going back into the '80s, would have gone through the process of finding out what they could or could not use this property for, and take whatever steps that are necessary, including delineation of wetlands before they purchased it." On cross-examination, Martin reiterated that in September 1989 a reasonable buyer and seller would have known that the condemned property was freshwater wetlands before they went to closing.
According to Martin, he suspected the property was wetlands from his initial visit because of the standing water he observed and from reviewing the soil log. He concluded that "the bulk of [the] property would have been probably classified a[s] wetlands," but because he was not an engineer, he did not attempt to make that determination. In addition, he did not value the property as wetlands because he felt since the State was seeking to acquire *594 only a small strip of land, one-tenth of the entire site, he wanted to give "the benefit ... to the property owner[s] for the highest negotiation that the State could use in trying to negotiate a settlement."
Martin appraised the property three times. He explained that he initially assessed the property as uplands and valued the taking at $132,000 for K. Hovnanian Corporation who had contracted with the State to do the jughandle work. Later he prepared a second appraisal for the State after it determined to condemn the property and valued the taking at $133,000. After receipt of Greene's Wetlands Delineation Report, Martin adjusted his appraisal downward to $48,300. Martin opined that while the property was zoned for professional office or commercial use, because of the extent of wetlands on the property, its highest and best use was "assemblage with other lands, professional, retail use, but it would have to be assembled with adjacent lands." The owners used the fact that the property had been appraised three times to attempt to undermine the State's credibility.
In addition, the owners presented John O. Lasser, MAI, as their expert to establish just compensation for the taking. He was not advised of the alleged wetlands condition of the property until after he had prepared his appraisal report in January 1992. Therefore, using comparable sales figures based entirely on uplands properties, Lasser valued the land at $450,000 per acre and concluded that just compensation for the condemned property and damage to the remainder was $422,600. He did not revise his opinion of the value after receiving Greene's report concerning the existence of wetlands because, he testified, the owners could not reasonably have known at the time of the taking about the wetlands condition. He did not dispute their delineation as wetlands, however. Lasser defined the term "fair market value" as a "term of art among appraisers" and that two of its assumptions are that the buyer and seller are "well-informed" and acting "prudently."
*595 As noted earlier, because of the judge's prior rulings, the focus of the testimony of both appraisers was on what a reasonable buyer would have known about the condition of the property in September 1989, the date of valuation. In rejecting the State's in limine motion to strike Lasser's report as irrelevant because not based on the actual condition of the property, the judge stated:
[I]t seems to me that the question is: What would a reasonable buyer have made of all this? That reasonably [a] buyer knowing that the State hadn't designated [the property] as wetlands [would the buyer] have determined that it's going to be wetlands when I go to build there. Isn't that the issue?
* * * * * * * *
[T]he jury should know all the facts to determine what the reasonable buyer or seller would have done if the reasonable buyer would have gone out and made an inspection that would result in the wetlands report. That's for the jury to determine. That's an issue of fact.
I don't know at this point what a reasonable buyer would have done. Even if I thought I knew, it's still a question of fact for the jury to determine....
* * * * * * * *
[I]f the jury is given the option of making the determination of whether or not the wetlands report is pertinent, and they were to decide from all the facts and all the evidence that the willing buyer would never have considered it, then they would have a right to make a determination based on the defendant's [the owners's] expert's report as to the valuation of the property.
Therefore, [plaintiff's] motion is denied.
At the conclusion of the trial, the owner's counsel argued to the jury that Greene's delineation of the property as wetlands was not worthy of belief because it was prepared "in anticipation of [her] testifying as an expert in the case." He also argued that the delineation was not part of an "overall regulatory process by the State," suggesting, therefore, that Greene's conclusions were not reliable. He told the jury
my suggestion to you is that this wetland issue is simply a red herring introduced by the State to pull down the value of the property in this condemnation.... My suggestion to you is that you put that wetlands issue out of your minds and go back to what both appraisers really said this was all about in '89, the difference between $133,000 and $422,600.
The judge did not instruct the jury concerning the State regulatory scheme under the Freshwater Wetlands Protection Act, *596 N.J.S.A. 13:9B-1 to -30, nor did he allow Greene to explain the process to the jury. The jury returned a verdict of $250,000.

II.
Under New Jersey law, when property is taken under the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, the measure of damages is the fair market value of the property as of the date of taking "determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." State by Com'r of Transp. v. Caoili, 135 N.J. 252, 260, 639 A.2d 275 (1994), quoting State v. Silver, 92 N.J. 507, 513, 457 A.2d 463 (1983). "Fair market value" is the "value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking." Ibid., quoting State v. Silver, supra, 92 N.J. at 514, 457 A.2d 463 (emphasis added). Most relevant in determining fair market value is the property's highest and best use, which should be considered in light of applicable land restrictions. See State by Com'r of Transp. v. Caoili, supra, 135 N.J. at 260, 639 A.2d 275.
Although we have not found any New Jersey case that specifically defines "knowledgeable parties," we are confident that they are individuals who are aware of all relevant information at the time of valuation whether or not such information is easily available. See City of Elko v. Zillich, 100 Nev. 366, 683 P.2d 5, 8 (1984) (fair market value assumes purchaser with knowledge of all uses for which land adapted); 4 Nichols, Law of Eminent Domain, § 12.02 at 75-76 (3rd Ed.Rev. 1989) (fair market value is amount "an informed and knowledgeable purchaser" would pay to "an informed and knowledgeable owner"). We are equally satisfied that "just" compensation requires indemnification of an owner for the actual market value of condemned property based on its true condition on the date of valuation. In the past, this court has held that an appraisal presented in support of a just compensation determination that ignores the actual physical condition of the *597 condemned property is "without substance." New Jersey Turn-pike Authority v. O'Neill, 133 N.J. Super. 445, 452, 337 A.2d 381 (App.Div. 1975).
The rationale for this principle was noted by Nichols, "the preeminent commentary on the law of eminent domain," San Diego County Water Authority v. Mireiter, 18 Cal. App.4th 1808, 23 Cal. Rptr.2d 455, 460 (1993), as follows:
Because some period of time must elapse under our forms of procedure between the date as of which the valuation must be made and the date when the valuation process is actually applied, the trier of fact often finds itself confronted with information affecting value which was latent or unknown at the time of the taking. The difficulty experienced in the handling of such information has stemmed from the use of the "market value" concept as an end in itself, rather than as a means to an end. Used as an end in itself, it obviously follows that since such knowledge was unknown at the date of the taking, it could have no influence one way or the other upon the market value on that date.
However, rules relating to the fixing of damages merely afford convenient measures of value that are ordinarily satisfactory and conclusive. They are, nevertheless, nothing more than a means to an end and that end is complete indemnity. Therefore, if appropriated land contains a valuable deposit, which is unknown at the time of the taking but discovered prior to the time when just compensation is determined, the owner (in order to be indemnified for the thing taken), must have the value of the deposit included in a reckoning of his award. In line with this view, it has been held that events that occur prior to the actual divestiture of title may be availed of to the detriment of the owner, where such facts show a reduction in the value. In jurisdictions where "actual value" is the object sought, it has been held that such knowledge may be considered. The thing to be ascertained, runs the argument, is not market value but actual value. Market value is taken as the criterion of compensation, based on the proposition that it is the true measure of actual value  the only practical test. (emphasis added)
[Id. 23 Cal. Rptr.2d at 460-61, quoting, 4 Nichols on Eminent Domain (3d Ed.Rev. 1989) § 12A.07[1].]
We are convinced that in New Jersey "actual value" in the sense of true value is the object sought irrespective of whether a willing buyer and seller acting without compulsion would have had knowledge of the condition on the date of valuation. So long as knowledge is acquired before a determination of just compensation is made, the jury must consider the actual condition.
Other jurisdictions that have directly addressed the issue of the effect of after-acquired information about the actual condition of property agree that such information must be considered in *598 determining just compensation. See, e.g., Mireiter, supra, 23 Cal. Rptr.2d 455. In Mireiter, the San Diego County Water Authority (Authority) condemned 1.64 acres of a vacant tract of 7.38 acres for the construction of a water pipeline. Id. 23 Cal. Rptr.2d at 456. Pursuant to the California Code of Civil Procedure § 1263.110, the date of valuation was established as June 29, 1990, approximately one and one-half years prior to the scheduled trial date. Ibid. In the intervening time period, approximately one year after the date of valuation, the Authority discovered that the property was covered by more vernal pools than had previously been thought. Ibid. As a result, the Authority reduced its estimate of just compensation prior to trial. Ibid. Rejecting the Authority's contention that the property had to be valued as encumbered by the newly-discovered vernal pools,[2] the California trial court, like the trial court in this matter, ruled that the post-valuation date discovery was relevant only to the extent that a "reasonable buyer and seller would have taken the probability of such conditions into account in fixing the selling price." Id. 23 Cal. Rptr.2d at 456-57.
In reversing the jury verdict, the California Court of Appeal held that "while evidence of a change in the condition of a property after the date of valuation may not be admissible, information about the condition of the property on the date of valuation which happens to be discovered after that date must be considered." Id. 23 Cal. Rptr.2d at 459. The court also found that "... the parties are presumed to know all relevant information at the time of trial, even if it could not reasonably have been discovered until after the date of valuation." Ibid.
*599 In concluding that the parties are presumed to be knowledgeable about the property valued, the Court of Appeal relied upon California's Code of Civil Procedure, § 1263.310, which provides that the measure of compensation "is the fair market value of the property taken," as well as § 1263.320, which defines "fair market value" as "the highest price on the date of valuation that would be agreed to by a seller ... and a buyer ... each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." Id. (emphasis added). This definition assumes parties who are fully knowledgeable of the facts regarding the condition of the property on the date of valuation. As previously noted, although not specifically addressed by our Supreme Court in State v. Silver, supra, 92 N.J. at 514, 457 A.2d 463, or State by Com'r of Transp. v. Caoili, supra, 135 N.J. at 260, 639 A.2d 275, we believe the concept of "knowledgeable" buyer imports the same meaning as set forth in the California Civil Code.
This conclusion is not inconsistent with Caoili notwithstanding the Court there found the critical issue in determining fair market value of condemned property resulting from a probable zoning change to depend on the reasonable belief of a buyer and seller. Caoili involved a potential change in legal use of the property after date of valuation, where reasonable parties negotiating over the property could differ in their view of whether the change would occur. In this case, we are dealing with an existing physical condition, albeit unknown to the parties on the date of valuation. In both cases the goal in valuing the taking is the same, namely, to reach a value nearest to the actual "uses and purposes for which the property is reasonably adaptable and available." California Code of Civil Procedure, § 1263.320.
Thus, we conclude in a condemnation case, the determination of fair market value of condemned property must be based upon the actual physical condition of the property on the date of valuation. After-acquired information about the condition discovered before trial must be considered by the factfinder in determining *600 just compensation. The definition of fair market value assumes that parties are fully knowledgeable concerning the physical condition of condemned property as of the date of valuation whether or not they are actually aware or could reasonably have become aware of the condition.
By viewing the issue in terms of what a reasonable buyer would know, the judge may have contributed to the jury's disregard of evidence reflecting the property's actual condition which, in turn, may have led the jury to an improperly based verdict. Because of the manner in which the judge initially defined the issue, from the owners' perspectives, the focus of the trial was not on whether the property consisted of wetlands, but rather on whether it was unreasonable to expect them to know the property was wetlands in 1989. On cross-examination, the owners stressed the fact that wetlands regulation by the State only began in 1988, at which time the maps and surveys were not widely available. Compounding the problem was the fact that at the close of the trial, the owners' counsel was permitted to argue to the jury that it should disregard the wetlands evidence as a "red herring" essentially because Greene and not the State had delineated the property as such.
The jury must have been confused. Unfortunately, the judge's charge did not help. The trial judge merely told the jury that just compensation was fair market value on the date of taking and then defined fair market value as "the price a willing buyer and willing seller would have finally agreed to on the date of taking after voluntary, arms length negotiations." He did not explain the regulatory process relating to wetlands delineation. In fact, the judge did not specifically mention the wetlands issue at all. Basically, the judge delivered the model jury charge used in condemnation cases after explaining how the jury was to evaluate the experts' testimony generally. Model Jury Charges 10.10, 10.11, 10.12 A and B and 10.14.
By giving a charge that ignored the wetlands issue and the effect of after-acquired knowledge of an existing condition, the *601 trial judge invited the jury to base its decision solely on the credibility of the experts without any guidance as to the correct legal principles involved. We cannot know whether the jury rejected or accepted the State's claim of wetlands. If it rejected it, then the evidence was sufficient to support the verdict. But if the jury concluded the property was wetlands but that the owners could not reasonably have known of its condition as such, then its $250,000 verdict was improper because the only wetlands valuation evidence in the record was presented by the State, and that was limited to $48,300. Thus, by initially denying both the State's motion to exclude Lasser's report and its motion to strike his testimony at the close of the owners' case, the trial judge impliedly permitted the jury to consider its award of "just and fair" compensation on an erroneous legal principle. Because there is no way we can determine the actual basis of the jury's award under these circumstances, we reverse and remand for a new trial.
Reversed and remanded for a new trial in accordance with this opinion.
NOTES
[1] Judge King did not participate in oral argument. However, the parties consented to his participation in this decision.
[2] The Mireiter court defined vernal pools as:

... temporary ponds of water, varying in size and duration, which form during the rainy season and disappear in the summer. They are associated with various species of plants and animals, some of which are endangered and some of which are found only in San Diego County. [23 Cal. Rptr.2d at 456].