[No. A090932. First Dist., Div. Four. Aug. 9, 2002.]

EMERYVILLE REDEVELOPMENT AGENCY, Plaintiff and Appellant,
v.
HARCROS PIGMENTS, INC., Defendant and Appellant.

[Nos. A091716, A093126. First Dist., Div. Four. Aug. 9, 2002.]

EMERYVILLE REDEVELOPMENT AGENCY, Plaintiff and Appellant,
v.
ELEMENTIS PIGMENTS, INC., Defendant and Respondent.

## COUNSEL

Natalie E. West, Carol R. Victor, Kevin D. Siegel, Karen W. Murphy, Michael Biddle, Benjamin L. Stock and Thomas A. Douvan for Plaintiff and Appellant.

Lee C. Rosenthal and William F. DiCamillo for California Redevelopment Association as Amicus Curiae on behalf of Plaintiff and Appellant.

James M. Berg, F. Gale Connor and Jeffrey B. Kirschenbaum for Defendant and Appellant and for Defendant and Respondent.

## OPINION

**SEPULVEDA, J.**—These consolidated appeals arise from a judgment and posttrial orders in an eminent domain proceeding brought by the Emeryville Redevelopment Agency (Agency or plaintiff) to condemn about 13 acres of chemically contaminated land owned by defendant Elementis Pigments, Inc., formerly Harcros Pigments, Inc. (Elementis or defendant). The appeals, and a cross-appeal by Elementis, present numerous questions of eminent domain law. We have concluded that the judgment must be reversed. Specifically, we hold that (1) the Agency's own purchases of neighboring properties were inadmissible to establish the value of the condemned property; (2) the jury could not consider, and the appraisal witnesses could not rely upon, a recital in a contract for the purchase of a neighboring property, which purported to "apportion" the overall price for the property between two segments divided by a political boundary; (3) it was error to admit, over objection, evidence concerning specific development plans for the property, since no one disputed the highest and best use for it and no other materiality was shown; (4) because it was undisputed that the property must inevitably be adapted to a higher and more valuable use, and because there was no proper ground for finding a qualifying period of "interim use," the trial court properly withheld from the jury Elementis's claim for loss of goodwill; (5) for the same reasons, however, defendant cannot recover for the value of equipment or fixtures "in place, in use." Our reversal of the judgment, coupled with intervening external events, makes it unnecessary or improper to address other issues, notably whether the trial court erred by excluding evidence of soil remediation costs and staying a corresponding portion of the judgment pending resolution of a federal cost-recovery action, and whether the court erred by awarding Elementis its attorneys fees.

## BACKGROUND

The property in question was originally occupied by a Native American midden, or shellmound, rising to a height of at least 40 feet. In the late 1800's the property held an amusement park known as Shellmound Park. Sometime in the 1920's it was leveled and developed for industrial use. At one time part of the property included a pesticide manufacturing operation. In 1987 the property was designated for inclusion in a 270-acre redevelopment project. In 1990, it was acquired by Elementis, which manufactured iron oxide pigments on the property. In 1992 Elementis notified the City of Emeryville (City) that it was permanently laying off 70 of its 85 employees. After that time it apparently continued to manufacture, or at least to blend, iron oxide pigments on a small part of the property.

In January 1996 Elementis indicated to the Agency that it was willing to sell the property to the Agency for fair market value. The Agency expressed interest but stated that "the existence of hazardous materials is of concern and will greatly impact [the property's] fair market value," and "at this time the Agency has little understanding as to the extent of contamination on the site and the cost of remediation." Almost a year later the parties negotiated two right-of-entry agreements permitting the Agency to conduct activities relating to appraisal and environmental testing. Ultimately the soil on the property was found to contain significant levels of contaminants including lead and arsenic. A dispute thereafter arose between the parties concerning, at least ostensibly, who would control the "remediation" (cleanup) of the property and what methodology would be employed.

On February 19, 1998, the Agency filed this action in eminent domain.[1] In May of 1998, the Agency deposited probable compensation of $1,062,000 with the State Treasurer and applied to the court for prejudgment possession and an order for entry. The court ultimately authorized the Agency to take possession of the most contaminated portions of the property by September 30, 1998, and the remainder by December 31, 1998. Around the end of 1998, Elementis relocated what remained of its operation to Colton in Southern California. The parties later stipulated that the "valuation date" for purposes of this matter would be November 1, 1998.

On January 11, 1999, after a trial limited to the "right to take," the court found that the Agency had the right to acquire the property by eminent domain.

---

[1] A month earlier Elementis had sued the Agency and the City for inverse condemnation, breach of contract, and deprivation of civil rights. The parties later stipulated to consolidate the two actions. Shortly before trial Elementis dismissed the inverse condemnation complaint.

In 1999, during demolition and soil remediation, extensive remnants of the original Emeryville shellmound were discovered on the subject property along with the remains of well over 100 humans. These materials constituted a cultural resource protected under the California Environmental Quality Act, Public Resources Code sections 21000 et seq. (CEQA) and triggered certain statutory requirements governing the treatment and disposition of such remains. (Pub. Resources Code, § 5097.98.) The Agency proceeded to take various steps to comply with these provisions. Defendant contended at trial that the Agency's actions exceeded statutory requirements and, thus, the reasonable cost of such compliance.

On August 4, 1999, the Agency and the City filed a complaint in the United States District Court for the Northern District of California, seeking monetary damages and other relief from Elementis, its predecessors, and others, based on the contamination of the subject property and neighboring properties, the necessity of remediating those properties, and the costs incurred in doing so. (*City of Emeryville v. Elementis Pigments, Inc.* (N.D.Cal., Aug. 6, 1999) No. C 99-03719 BZ.) The complaint invoked a variety of federal and state laws, most notably the Comprehensive Environmental Response, Compensation, and Liability Act, title 42 United States Code section 9601 et seq. (CERCLA).

On November 8, 1999, with the federal action still pending, trial commenced in this action on the issue of the "just compensation" to be awarded to Elementis. On December 20, 1999, the jury returned a verdict fixing the fair market value of the property at $12,493,283. The trial court entered a judgment condemning the property to the Agency. However the court stayed a portion of the award, equal to the soil remediation costs claimed to have been incurred by the Agency, pending further developments in the federal lawsuit.

The Agency filed a timely appeal from the judgment (case No. A090932), in which Elementis filed a cross-appeal. The Agency appealed separately from postjudgment orders allowing, and fixing the amount of, costs and attorneys fees. (Case Nos. A091716, A093126.) We have already consolidated the first two appeals, and have implicitly granted the plaintiff's unopposed request that all three appeals be considered together.

While the appeals were pending, both parties requested judicial notice of a written settlement agreement reached by them and approved by the court in the federal lawsuit. In the agreement, Elementis promised to compensate the City with (1) "cash consideration" of $3,850,000, and (2) "forbearance

consideration" in the form of the relinquishment of claims against the City for over $2,450,800 in relocation benefits. It was further agreed that the cash consideration (plus interest) would "be a credit in Emeryville's favor against any sums Emeryville may be required to pay Elementis in satisfaction of a final judgment resulting from the Eminent Domain Appeal or subsequent proceeding resulting from that Appeal."

## I.

### Agency's Purchases of Neighboring Properties

The state's power to take property by eminent domain is conditioned on its obligation to pay "just compensation" to the owner. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) "Just compensation" is defined as "fair market value" (Code Civ. Proc., § 1263.310), which in turn is defined as "the highest price on the date of valuation that would be agreed to by a seller . . . and a buyer . . . each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available" (*id.*, § 1263.320). ■ The constitutional guarantee of "just compensation" is obviously intended to protect the landowner, but it also protects the public by limiting its liability to losses that can fairly be attributed to the taking. " 'A landowner is not entitled to be placed in a better position financially than he was before the condemnation; neither is the state required to pay more than land is worth merely because of some theoretical, intangible concept.' " (*San Diego County Water Authority v. Mireiter* (1993) 18 Cal.App.4th 1808, 1817 [23 Cal.Rptr.2d 455] (*Mireiter*), quoting *City of Fresno v. Cloud* (1972) 26 Cal.App.3d 113, 123 [102 Cal.Rptr. 874].)

■ Here both parties sought to establish the fair market value of the subject property through analyses, by expert appraisers, of "comparable sales." (See Evid. Code, § 816; cf. *id.*, § 819 [capitalized income approach].) Under this method, the appraiser identifies sales of properties deemed to resemble the condemned property in relevant respects, and then derives a market value for the condemned property from the prices paid for these "comparables," typically adjusting the price to reflect such matters as material differences between the properties and differences in market forces between the time and location of the comparable sale and that of the property being valued.

■ Prior to trial the Agency moved in limine to bar Elementis from using, as comparables, any "sales of property to the Redevelopment Agency." The motion asserted that six of the 15 transactions disclosed prior to trial as a basis for the appraisal by defendant's witness Clevenger were

purchases by the Agency, for public use, of property it could have condemned, and were therefore inadmissible under Evidence Code section 822, subdivision (a)(1) (section 822(a)(1)). The court denied the motion. At trial, Clevenger relied on 12 comparables, of which three were purchases by the Agency of properties neighboring the Elementis land.

This evidence should have been excluded under section 822(a)(1), which at the time of trial provided as follows: "(a) In an eminent domain or inverse condemnation proceeding, . . . the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of property: [¶] (1) The price or other terms and circumstances of an acquisition of property or a property interest if the acquisition was for a public use for which the property could have been taken by eminent domain, except that the price or other terms and circumstances of an acquisition of property appropriated to a public use or a property interest so appropriated shall not be excluded under this section if the acquisition was for the same public use for which the property could have been taken by eminent domain."

■ We first reject Elementis's assertion that the decision whether to admit the evidence in question, over an objection based on the foregoing statute, is subject to deferential review as a matter entrusted to the trial court's discretion. Whatever section 822(a)(1) means, it does not confer a discretionary power on the trial court. It categorically excludes evidence of a specified character, subject to a stated exception.[2] ■ Nor is there any dispute as to the relevant facts. Accordingly we must exercise our independent judgment in reviewing the ruling at issue. "The interpretation of a statute . . . is a question of law . . . ." (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) "A trial court's interpretation of a statute is reviewed de novo," and "the application of a statutory standard to undisputed facts is reviewed de novo." (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718].)

■ We also reject any suggestion that the statute was intended only, or primarily, for the protection of property owners, and thus should have little or no effect where, as here, the *condemnee* offers evidence of other acquisitions for a public use. The only support offered for such a view is a dictum

---

[2] Evidence otherwise barred by section 822(a)(1) may become admissible where there is "no relevant, comparable market" for the condemned property. (Evid. Code, § 823.) Elementis does not rely on this statute. None of the appraisers had any difficulty finding other comparable properties.

in *County of Los Angeles v. American Sav. & Loan Assn.* (1972) 26 Cal.App.3d 7, 13 [102 Cal.Rptr. 439], that the purpose of section 822(a)(1) is "to preclude use of the price or other terms that may have been acceded to by the transferor only because of the threat of condemnation." This statement cannot justify a departure from the language of the statute, which on its face embodies the former court-made rule that "it is not competent for *either* party in a condemnation proceeding to put in evidence the amount paid by a condemning party to the owners of adjacent lands, however similar they may be to that in controversy, because the price paid under such circumstances 'is not a reasonable or fair test of market value.' " (*City of Los Angeles v. Cole* (1946) 28 Cal.2d 509, 517-518 [170 P.2d 928], italics added; see *Ventura County Flood Control Dist. v. Campbell* (1999) 71 Cal.App.4th 211, 222 [83 Cal.Rptr.2d 725]; cf. *County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680] [arguably overruling *Cole* on this point, but itself abrogated to that extent by § 822(a)(1)].) As discussed more fully in the following section, the price distortions in such a transaction are at least as likely to favor the seller as the buyer. (See discussion at p. 1107, *post.*)

■ We turn to the question whether the Agency's purchases here fall within the rule declared by the statute, i.e., that evidence of an acquisition of property is categorically inadmissible "if the acquisition was for a public use for which the property could have been taken by eminent domain . . . ." (§ 822(a)(1).) It is undisputed that the evidence here fit this description. The Agency purchased these properties for redevelopment, a public use. Accordingly those purchases were inadmissible unless they came within an *exception* to the statutory rule of inadmissibility.

As in effect at trial, the statute's single exception exempted evidence of "an acquisition of *property appropriated to a public use* . . . if the acquisition was for the same public use for which the property could have been taken by eminent domain." (Former § 822(a)(1); Stats. 1987, ch. 1278, § 1, p. 4548, italics added.) Elementis has never attempted to show that the purchases here fall within this exception, and we are satisfied that they do not. The exception applies only to acquisitions of "property appropriated to a public use," which generally means property *already in public use*. This phrase is most commonly used where an entity seeks to condemn property already put to a public use by another entity charged with a public function. (See Code Civ. Proc., § 1235.180 [defining " '[p]roperty appropriated to public use' " as "property either already in use for a public purpose or set aside for a specific public purpose with the intention of using it for such purpose within a reasonable time"]; *id.,* § 1240.510 [one authorized to exercise power of eminent domain may take property "appropriated to public

use" where taking will not unduly interfere with existing use]; *id.,* § 1240.610 [entity may take property where new use is "a more necessary public use than the use to which the property is appropriated"]; *id.,* § 1240.650, subd. (a) [new use is deemed more necessary than existing use where second taker is public entity and current holder is not]; Health & Saf. Code, § 33395 [redevelopment agency may take "property already devoted to a public use," but "[p]roperty of a public body shall not be acquired without its consent"].)

That the exception applies only to property already in public use is also evident from the legislative history. Prior to 1986, the statute excluded all evidence of acquisitions for a purpose for which the property could have been taken by eminent domain. (Stats. 1980, ch. 381, § 5, p. 758.) Toward the end of the 1986 session, the Legislature amended the statute, by negative qualification, so that the statute only barred evidence of acquisitions of "property not appropriated to a public use." (Stats. 1986, ch. 1238, § 2, p. 4349.) In 1987, the Legislature restated this qualification as an affirmative exception and *further qualified the exception* so that it only applied "if the acquisition was for the same public use for which the property could have been taken by eminent domain." (Former § 822(a)(1); Stats. 1987, ch. 1278, § 1, p. 4548.)

Contemporaneous evidence of legislative intent establishes that (1) the 1986 amendment was never intended to apply to acquisitions of private property, but was aimed at a very specific category of public utility property; and (2) the 1987 amendment was an attempt to *correct a perceived overbreadth* in the 1986 amendment by further limiting the class of transactions which would be admissible.[3] An undated "Author's Statement," addressed to an unidentified committee (presumably the Assembly Committee on the Judiciary), states that the 1986 amendment "sought to correct a problem for *water districts* in that the only comparables were other water districts.[4] The intent was to provide comparables, but *the language is too broad . . . .* [¶] [This bill] will allow the purchase price of a *public property* to be used as a 'comparable' only when *the same public use* will be continued . . . ." (Assemblyman Harris, Author's Statement on Assem. Bill No. 616 (1987-1988 Reg. Sess.), p. 1, italics added.) An Assembly committee analysis

---

[3]In support of its motion in limine the Agency requested judicial notice of copies of the materials quoted in this paragraph. So far as we can tell, Elementis raised no objection to the request. We discern no potential objection other than one of authenticity. We have discovered the same materials through independent research. We conclude that they are properly before us.

[4]As adopted, the bill making the 1987 amendment also created a new statute (Pub. Util. Code, § 1405.1) which affected only the condemnation of property belonging to "water corporations" or "water companies." (Stats. 1987, ch. 1278, § 2, pp. 4549-4551.)

reports the view of the originating agency that the 1986 amendment permitted evidence of "acquisition[s] of comparable property that is *already in public use* . . . . [¶] . . . [¶] . . . [T]he exception . . . is too broad because *it permits the use of a price paid for public property* . . . without regard [to] whether the acquisition was for a purpose for which the acquiring agency had the power to condemn the property." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 616 (1987-1988 Reg. Sess.), for hearing of May 13, 1987, pp. 1-2, italics added.) Similarly, a Senate committee analysis noted that under the 1986 exception, "the admission and use of . . . an acquisition of property that is *already in public use* is permitted . . . . [T]he price paid by a public entity to a *private owner* is generally inadmissible but the price paid for *public property between public entities* may be admissible . . . . [¶] This bill *narrows the exception* to the general rule . . . ." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 616 (1987-1988 Reg. Sess.), as amended July 1, 1987, for hearing of July 7, 1987, pp. 1-2, italics added.)

In sum, the statute as in effect at trial prescribed (1) a rule of excluding acquisitions for public use, which rule plainly applied to the purchases in question; (2) an *exception* for property *already* in public use, which exception plainly did *not* apply; and (3) a *limitation on the exception,* which was irrelevant because the exception was inapplicable by its core terms.

Elementis makes no attempt to explain how the purchases here could be admitted consistent with the statutory language or history. Instead it cites *City and County of San Francisco v. Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203 [18 Cal.Rptr.2d 467] (*Golden Gate*). In that case another division of this court affirmed a judgment despite the trial court's admission of evidence, over the condemnee's objection, of a city's purchase of neighboring properties. The condemnee contended that the 1987 amendment to section 822(a)(1) applied only to utility property. The court seemed to dismiss this interpretation, stating, "We do not read the statute as so limited. Nor does [the condemnee's] cited authority so state." (*Golden Gate,* at p. 1210, citing 1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar supp. 1992) § 9.49, p. 161.) But the court offered no interpretation of its own. Instead it held that any error in the admission of the evidence was harmless. (*Ibid.*)

We are uncertain that *Golden Gate* is properly understood to *hold* that the evidence there was admissible. Certainly no supporting analysis or rule of decision is provided. So far as we can tell, any attempt to follow that case would read section 822(a)(1) right out of the code. In any event, the matters

we have already discussed compel us to conclude that the evidence here fell squarely within the general rule of inadmissibility.

We also note that in 2000 the Legislature again amended the statute. As amended, the statute continues to declare the general inadmissibility of "an acquisition of property . . . for a public use for which the property could have been taken by eminent domain." (§ 822(a)(1).) In place of the confusingly qualified 1987 exception, the statute now provides, "The price or other terms and circumstances shall not be excluded pursuant to this paragraph if the proceeding relates to the valuation of all or part of a *water system* as defined in Section 240 of the Public Utilities Code." (*Ibid.*, italics added.)

A Senate floor analysis indicates that the California Law Revision Commission, which sought the 2000 amendment, considered the prior language "confusing," and believed that the court in *Golden Gate* had "misconstrued this poorly drafted exemption . . . [by] allowing evidence of prices paid by the same condemnor to acquire adjacent private property for public use." (Sen. Com. on Judiciary, Office of Floor Analyses, Analysis of Assem. Bill No. 321 (1999-2000 Reg. Sess.) as amended Aug. 16, 1999, pp. 3, 4, at <http://www.leginfo.ca.gov/bilinfo.html> [as of Aug. 9, 2002].) According to the bill's author, the 1986 and 1987 amendments were "created for the acquisition of property by water districts." (*Ibid.*; see also Assem. Floor Analysis of Assem. Bill No. 321 (1999-2000 Reg. Sess.) as amended May 6, 1999, pp. 1-2, at <http://www.leginfo.ca.gov/bilinfo.html> [as of Aug. 9, 2002] ["CLRC recommended this 'clarification' after an appeals court misinterpreted Evidence Code Section 822"].)

These amendments postdated the trial in this matter and therefore cannot, of their own force, govern the issue before us. ■ But while the interpretation of existing laws is a quintessentially judicial function, courts may and must give due consideration to the Legislature's stated views on "the prior import of its statutes." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 [62 Cal.Rptr.2d 243, 933 P.2d 507], quoting *California Emp. etc. Com. v. Payne* (1947) 31 Cal.2d 210, 213-214 [187 P.2d 702] [" '[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act' "]; *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1007-1008 [90 Cal.Rptr.2d 236, 987 P.2d 705].) ■ In adopting the 2000 amendment the Legislature confirmed that the statute does not authorize the admission of evidence of acquisitions of property privately

held for private use. To this extent, at least, we believe that amendment both declared, and accurately characterized the effect of, existing law.

In sum, section 822(a)(1) has always barred evidence of acquisitions for public use of purely private property. The purchases at issue here fell squarely within this ban, and were inadmissible. Accordingly, it was error to admit evidence of these purchases over the Agency's objection.

## II.

### Contractual Recital in Comparable Sale

 The expert appraisal witnesses for both sides accepted as a comparable sale, and relied for their valuations upon, the 1997 sale of the "Ikea property," which straddled the boundary between the cites of Emeryville and Oakland. The purchase price for the property was stated in the governing contract as "$21.00 per foot, which equals $14,148,592.92." However, in pretrial discovery it emerged that Elementis's appraiser Clevenger set a per-square-foot value of $27.64 on *the Emeryville portion* of the property. Asked in deposition how he arrived at this figure, he alluded to a contract provision purporting to "allocate[]" specified proportions of the purchase price between the Emeryville and Oakland portions of the property.[5] When pressed by counsel to explain his reasoning, he merely cited this provision, saying, "That's what it says. You didn't read it."

Based on these facts the Agency moved in limine "[t]o preclude evidence contesting the purchase price of . . . the Barbary/Ikea sale at $21 per square foot, or, in the alternative for judicial determination of the purchase price of that sale as intended by the purchase agreement." The Agency cited, among other things, the rule against "appraising the comparable," as codified in Evidence Code section 822, subdivision (a)(4) (see p. 1102, *post*). Plaintiff asserted that the cited provision of the contract was probably intended to minimize the seller's liability for Oakland's real estate property transfer tax, which had no parallel in Emeryville.

The trial court denied the motion, writing: "The plain language of the contract . . . allocates the purchase price between two zones of the property. The trier of fact is entitled to hear and weigh the expert opinions regarding

[5]"Allocation of Purchase Price. Seventy-three percent (73%) of the applicable Purchase Price is allocated to the portion of the Property situated in the City of Emeryville and the remaining twenty-seven percent (27%) of the applicable Purchase Price is allocated to the portion of the Property situated in the City of Oakland. The Purchase Price shall be payable on the Closing Date in Cash upon the Close of Escrow."

the allocation and whether there is a fair market value difference between the portion of the [Ikea] property located in Emeryville versus the property located in Oakland."

This was error. The recital as to the "allocation" between the two "zones" of the property was inadmissible both as direct evidence and as a basis for Clevenger's expert opinion. To begin with, it was inconsistent with the purpose for which comparable sales are admitted, which is to "giv[e] the jury the benefit of some *'objective'* market evaluation against which to check an appraiser's valuation [citation]." (*People ex rel. Dept. Pub. Wks. v. Reardon* (1971) 4 Cal.3d 507, 515 [93 Cal.Rptr. 852, 483 P.2d 20], italics added.) The *objective* datum in a real estate sale is the *consideration actually given* for the *property purchased.* It is this *exchange of values* which defines the market and provides an objective benchmark for other exchanges of comparable properties.

The only objectively determinable market price in the Ikea contract was the sum agreed to be paid for the property as a whole, i.e., $14,148,592.92. The "allocation" provision had no effect on the exchange of values between the parties and carried no assurance that it accurately reflected market forces. Nor did it have any discernible effect on the *legal* relations of the contracting parties. It was not a contractual undertaking, but a declaratory statement on a matter of no apparent consequence as between the signatories. The law has long distinguished between a "covenant" which creates legal rights and obligations, and a "mere recital" which a party inserts for his or her own reasons into a contractual instrument. Recitals are given limited effect even as between the parties.[6]

The recital here does not even concern a matter of *fact* but states at most the *opinion* of one or both parties that one part of the property is more

---

[6]See *McDonough v. Chu Chew Shong* (1937) 21 Cal.App.2d 257, 259 [68 P.2d 976] (designation of offenses in contract to indemnify bail bondsman was a "mere recital and form[ed] no part of the contractual obligation"); *County of Los Angeles v. Farnsworth* (1935) 4 Cal.App.2d 516, 522 [41 P.2d 577] (reference to county's prior acceptance of highways for dedication "was nothing more than a recital of something that had already taken place and was not in any sense contractual"); *Hunt v. United Bank & Trust Co.* (1930) 210 Cal. 108, 115 [291 P. 184] (while recitals may operate as covenants if intended to effect an undertaking, "[t]he essential feature of a contract is the promise"); *O'Sullivan v. Griffith* (1908) 153 Cal. 502, 506 (recitals concerning issuance of franchises to grantors "d[id] not state any contract or agreement on the part of the grantors," but "merely declare[d] the chain of title" and "serve[d] as a more particular description of the thing [granted]"; while "[t]hey might constitute an estoppel against the grantors," they "d[id] not express any agreement"); cf. *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 37-38 [31 Cal.Rptr.2d 378] (provision of lease was not " 'mere' recital," and even if it was, resort to it was necessary to interpret covenants).

valuable than another. Statements of opinion are admissible in evidence only when they satisfy the requirements of Evidence Code section 800 et seq. Evidence Code section 822, subdivision (a)(4) (section 822(a)(4)) renders inadmissible "[a]n opinion as to the value of any property or interest other than that being valued." The "allocation" provision recited an opinion concerning the relative value of two portions of the Ikea property. Since each such portion was a "property or property interest other than that being valued" (i.e., other than the Elementis property), the recital was an appraisal of the comparable (or a part thereof) and was inadmissible under section 822(a)(4).

Elementis contends that the allocation provision was admissible on a "'zone of value'" theory under *Mireiter, supra*, 18 Cal.App.4th 1808, 1818. The question there was whether an appraiser could permissibly derive a value by dividing *the condemned property* into three "zones" and analyzing comparable sales for each. The court's analysis has no bearing on an attempt, such as the one here, to divide a *comparable* property into "zones" and allocate a purchase price between them. Such an attempt is a patent appraisal of the comparable barred by section 822(a)(4).

Similarly unavailing is Elementis's citation of *People v. University Hill Foundation* (1961) 188 Cal.App.2d 327, 333 [10 Cal.Rptr. 437]. The court there found "no prejudicial error" in connection with an appraiser's testimony purporting to allocate a comparable sale between land and buildings. From the opinion we cannot ascertain the nature of the objection in the trial court or of the point being urged on appeal. In any event the case, like *Mireiter, supra*, 18 Cal.App.4th 1808, fails to mention the rule against appraising the comparable. ▮ "Cases are not authority for propositions not considered." (*City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 57 [115 Cal.Rptr.2d 151].)

▮ Section 822(a)(4) was duly invoked here. It operated not only to bar direct evidence of the "allocation" recital, but also to prevent its being "taken into account as a basis" for appraisal testimony. (§ 822(a)(4).) The trial court erred by permitting the recital to be admitted in evidence and relied upon by the witness Clevenger.

### III.

*Evidence of Project*

▮ Plaintiff moved in limine to exclude evidence of a development project, generally referred to below as the Emeryville Town Center project,

in which it planned, and had agreed with a developer, to include the subject property. Plaintiff cited the rule that evidence of a specific plan or project is inadmissible to show the value of the subject property. (Code Civ. Proc., § 1263.330 ["The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to . . . [¶] (a) The project for which the property is taken . . . ."]; *Merced Irrigation Dist. v. Woolstenhulme* (1971) 4 Cal.3d 478, 491 [93 Cal.Rptr. 833, 483 P.2d 1] ["the increase in value which a condemned tract gains when it is valued as part of the proposed project . . . could never be considered in determining 'just compensation' under the established definition of 'market value' " (italics omitted)].)

The trial court denied the motion. Citing *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860 [135 Cal.Rptr. 647, 558 P.2d 545] (*Decker*), the court wrote that "evidence of the Emeryville Town Center project" was admissible "to help demonstrate the highest and best use of the property," and "to rebut plaintiff[']s contentions that the property is stigmatized and not suitable for development."

This ruling cannot be sustained. In *Decker, supra,* 18 Cal.3d 860, a city sought to condemn land near an airport. The "principal valuation issue at trial" was the highest and best use for the property. (*Id.* at p. 864.) The landowner's appraiser testified that the highest and best use was airport-related purposes, "especially parking." (*Ibid.*) The city's appraisers testified that the highest and best use was residential. (*Ibid.*) In argument to the jury, the city's attorney denied that there was demand for airport parking. (*Id.* at pp. 864-865.) The jury found a value based on residential use. (*Id.* at p. 865.) Shortly after entry of judgment, the city approved an environmental impact report recommending construction of a parking facility on the property. (*Ibid.*) It was assumed that the city knew, at the time of trial, that the property was going to be used for a parking lot. (*Id.* at p. 866.)

The court considered the "intersection of . . . two rules" (*Decker, supra,* 18 Cal.3d 860, 867), i.e., (1) that "condemned property is not to be valued as part of the proposed improvement" (*id.* at p. 866), and (2) that " '[i]f . . . the condemnor's proposed use is one of the highest and best uses of the property, the adaptability of the property for that purpose may be shown by the property owner' " (*id.* at p. 867, quoting 12 Cal. Law Revision Com. Rep. (1974) § 1263.330, p. 1834). The court reasoned that "[t]he city's determination as to the adaptability of the property for airport parking purposes was relevant to show that the property in the hands of defendant and not as part of the project could have been used for airport parking."

(*Decker*, at p. 869, italics omitted.) Thus "the evidence of the city's determinations as to the need for airport parking and the suitability of defendant's property for such purpose would have been admissible to show the highest and best use of the property in the hands of defendant." (*Ibid.*) The court held that the city, through its attorney, committed misconduct warranting reversal. (*Id.* at pp. 871-872.)

The present case bears virtually no resemblance to *Decker, supra,* 18 Cal.3d 860. There the question of highest and best use was disputed, with the condemnor "den[ying] that the use which it was in fact going to make of the property was the highest and best use," and "even conceal[ing] such fact from defendant." (*Id.* at p. 867.) Here it was undisputed that the highest and best use for the property was mixed commercial use. Nor did the Agency suggest, as the condemner did in *Decker*, that there was no "need" for mixed commercial property. Rather counsel for the Agency said, in her opening statement, "No one disagrees about the highest and best use of this property. Everyone agrees that ultimately this property can be used for some sort of mixed-use commercial/retail development." Counsel for Elementis said the same thing in his closing jury argument, referring to the property's "highest and best use, which everyone is agreeing is a mixed-use shopping center." The court itself, in ruling on another motion in limine, noted that one of defendant's experts "agree[d] that the highest and best use of the subject property is mixed commercial uses encompassing retail, food and beverage and entertainment."

Because these matters were undisputed, the rationale for admitting the evidence in *Decker* was inapplicable. Other cases cited by defendant are likewise inapposite. In *People ex rel. Dept. of Transportation v. Tanczos* (1996) 42 Cal.App.4th 1215 [50 Cal.Rptr.2d 70], it was error to exclude evidence of the condemnees' building plans, because the condemnor made feasibility "the central issue" by contending that the property could not accommodate a use of the type depicted in the plans. (*Id.* at p. 1219.) Excluding the evidence prevented the condemnees from "defend[ing] their position [or] challeng[ing] the State's." (*Id.* at p. 1220.) In *People v. La Macchia* (1953) 41 Cal.2d 738 [264 P.2d 15], an unspecified "portion" of testimony concerning the condemnees' plans was properly admitted "as a description of the uses to which the properties were adaptable," but the majority of the testimony was objectionable as falling "squarely within the rule which prohibits the admission of evidence concerning an owner's purposes with regard to his property." (*Id.* at p. 752.) The prejudicial effect of the latter evidence, however, was "offset" by other similar evidence received without objection. (*Ibid.*) In *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 929 [62 Cal.Rptr.2d

121], evidence of certain diagrams showing where an existing building might be expanded was held admissible in support of a claim for severance damages where it did not constitute evidence of "a specific plan."

We believe the lesson of *Decker* and similar cases is that evidence of specific project plans is inadmissible in the absence of specific facts or points of contention that demonstrably enhance the probative value of the evidence to a point where it outweighs the inherent potential for prejudice. That test is not satisfied merely because the plans "illustrate" or "demonstrate" an undisputed potential use for the property. If evidence of project plans could be introduced on that rationale, it would seem to be admissible in *every* case, and the rule to which *Decker* is an exception would cease to exist.

The trial court also indicated that evidence of the Agency's plans was admissible to rebut the Agency's evidence that development of the property would encounter *barriers* such as "stigma" and the costs and risks of hazardous substance remediation and archaeological mitigation. Thus the court said, "I expect there is going to be some expert testimony from the Agency or offered by the Agency that suggests that this is very difficult property, a person or an entity going into the negotiation process for the acquisition of this property would be very concerned about all the downside risks to this property, and it seems to me that it is relevant. [¶] And I think *Decker* permits the defendants in this instance to say, Yes, those are factors to be considered, but it's also true that good things have happened from the development of similarly situated property in this area or in this vicinity."

The court thus concluded that evidence of the Agency's plans, and apparently of its dealings with the proposed developer, had sufficient probative value with respect to the *feasibility of development* to outweigh the risk that the jury would improperly consider those plans and dealings in determining value. In fact, however, the *Agency's* expectation that *it* (or a developer aided by it) could surmount obstacles to development had little tendency to show how a hypothetical buyer in the open market would have viewed those obstacles. Almost *any* property *can* be developed; the question is at what cost. (See *Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 210 [249 Cal.Rptr. 743] (conc. opn. of Poché, J.) ["Aside from the crater of an active volcano, there is probably no piece of land that cannot be developed, given a big enough investment of money and effort." (Italics omitted.)].) The very function of a redevelopment agency is to restore to productive use properties suffering from "blight," which can only be developed to productive use with public assistance. (See Health & Saf. Code, §§ 33030, 33031.) It is thus the

declared policy of the state "[t]hat whenever the redevelopment of blighted areas *cannot be accomplished by private enterprise alone,* without *public participation and assistance* in the acquisition of land, in planning and in the *financing* of land assembly, in the work of clearance, and in the making of improvements necessary therefor, it is in the public interest to employ the power of eminent domain, to *advance or expend public funds for these purposes,* and to provide a means by which blighted areas may be redeveloped or rehabilitated." (*Id.,* § 33037, subd. (b), italics added.)

The function and powers of redevelopment agencies, as well as the prescribed conditions for exercising those powers, militate distinctly against the supposition that such an agency's plans for a property tend to show what a buyer on the open market would expect to pay for developing that same property. Agency counsel here asserted that the project was "taking such enormous public subsidies that it could never be built by the private market." If the landowner were free to rely on evidence of the Agency's intentions to show economic feasibility, it would seem equally logical for the agency to respond with evidence of all the direct and indirect subsidies and other forms of assistance it and other public entities expected to provide in support of the project. The landowner would presumably counterattack with criticism of the Agency's decisions, perhaps presenting a sample of unguarded comments from records of agency proceedings. The jury would be drawn into something approaching a referendum on the condemnor's conduct. When the smoke cleared the jury might be prejudiced in any number of ways for or against either party. The surest outcome is that it would have been grossly distracted from the issue at hand, which is the market value of the property.

The Agency's plans for the property are admissible only if, and to the extent, they are shown to possess a distinct and substantial probative value *other* than to establish points on which there is no controversy. Since no such value was ever identified here, it was error to admit evidence of those plans.

## IV.

### *Prejudice*

We are satisfied that the foregoing errors require reversal in that, had they not been made, the jury would probably have fixed the fair market value at a figure more favorable to the Agency.

Elementis argues that the evidence of Agency purchases was harmless because, of the 25 sales cited by the appraisal witnesses, only three were Agency purchases. Those three purchases, however, seem to have played a

central role in Elementis's trial strategy. They were the first comparables discussed by counsel in his opening jury summation. They also formed a primary basis for a complex network of prejudicial insinuations concerning the Agency's conduct before and during trial.

One such insinuation, conveyed through questioning of a member of the Agency's governing board and a member of its staff, suggested that if the price paid for these properties exceeded fair market value, it constituted a "gift" of "taxpayer funds" or "public funds." This suggestion was inaccurate at best. California law encourages a condemner to make a generous settlement offer before taking any condemnation case to trial, and exposes the condemner to adverse consequences if the offer is found to be unreasonable.[7] Under the statutory constraints thus imposed, one would expect a prudent condemner to offer its best estimate of fair market value *plus* some reflection of its own savings from avoiding trial, with a further upward adjustment for elimination of potential liability for the condemnee's litigation expenses. The chances seem good that such an offer would exceed the fair market value of the property. Indeed courts have recognized that a prospective condemner may well pay a price in lieu of condemnation "more generous than is required under the Constitution." (*Klopping v. City of Whittier* (1972) 8 Cal.3d 39, 51-52, fn. 4 [104 Cal.Rptr. 1, 500 P.2d 1345]; see *South Bay Irr. Dist. v. California-American Water Co.* (1976) 61 Cal.App.3d 944, 984 [133 Cal.Rptr. 166] ["a public agency may agree upon a price more favorable to the seller than a private investor would agree upon"]; *ibid.*, quoting the trial judge [" 'historically governmental agencies have paid a premium over earnings when acquiring utility properties' "].)

Counsel's contrary suggestion apparently rests on the concurring opinion in *Redevelopment Agency v. Gilmore* (1985) 38 Cal.3d 790, 809 [214 Cal.Rptr. 904, 700 P.2d 794], which Elementis quotes in its brief on appeal. There Justice Mosk wrote that "to *assess* more than just compensation runs the risk of violating the prohibition against making a gift of public funds. (Art. XVI, § 6.)" (*Ibid.*, italics added.) But he was not speaking of purchases in lieu of condemnation; he was speaking of judicial rules awarding excessive compensation in *litigated* cases. (*Ibid.*) Indeed it was also Justice Mosk who wrote the opinion in *Klopping v. City of Whittier, supra,* 8 Cal.3d 39, in

---

[7] In all cases a condemner must make a "final offer of compensation" prior to trial. (Code Civ. Proc., § 1250.410, subd. (a).) If the trial court ultimately finds that the offer was unreasonable, it "shall" allow the condemnee to recover "litigation expenses," including attorney fees, expert fees, and trial preparation costs. (Code Civ. Proc., §§ 1250.410, subd. (b), 1235.140.) Moreover, at least where an acquisition will displace an existing use, the condemner must "make every reasonable effort" to acquire the property "by negotiation." (Gov. Code, § 7267.1, subd. (a); see § 7267.)

which a unanimous court flatly contradicted the premise that the price paid in lieu of condemnation cannot lawfully exceed fair market value.

Counsel's suggestion to the contrary was not only inaccurate but also highly damaging to the Agency's position. It created obvious impediments to any inference setting a fair market value below what the Agency had paid for neighboring properties. The denials by Agency witnesses of any "gift of public property" strengthened the inference that the prices paid for these properties were in fact at or below fair market value—the very inference proscribed by section 822(a)(1). Counsel sought to reinforce this inference by arguing that these purchases were "Agency-controlled transactions," presumably meaning that the prices paid must be low because of "what happens when you go to fight City Hall." And should the jurors conclude that any of the sums paid *exceeded* fair market value, they were faced with the unsavory spectacle of a "gift of public funds." Counsel also suggested that the price paid for these properties, whether above or below market value, should set a minimum level for the jury's verdict because otherwise the Agency would have succeeded in perniciously discriminating against Elementis by treating it differently from its neighbors.

The evidence of Agency purchases also played an implicit role in counsel's attempts to paint Elementis as the victim of an Agency strategy to suppress evidence of the subject property's true value. In this context, the Agency's failure to itself present evidence of its purchases of neighboring properties—a failure reflecting its correct belief that the evidence was categorically inadmissible—supported the overall attack on the credibility of the Agency's evidence, and that of its appraiser.

We note that even without these prejudicial inferences, the jury's finding of fair market value probably rested in significant part on at least one of the subject purchases: the "Sepulveda Property," which was immediately adjacent to the Elementis property. Elementis's appraiser Clevenger testified that the Sepulveda sale took place in "November '98, almost right exactly on [the] valuation date" of the Elementis property. He said that the purchase reflected a negotiated "agreement of the market value." He said that he understood the purchase documents to reflect a belief by the "parties to that transaction . . . that . . . a *fair market value* was being paid." He also asserted that the Sepulveda property was "highly contaminated with the same kind of material or chemical that the subject property is contaminated

with."[8] The Agency paid $28.50 per square foot for the Sepulveda property. The jury fixed the value of the Elementis property at $29 per square foot. These nearly identical values strongly suggest that the jury weighed the Sepulveda property heavily in its calculations.

The inference of prejudice that rises from the admission of the Agency purchases takes on added weight from the other errors we have noted. The evidence of the "allocation" provision in the Ikea purchase contract was likely to encourage the jury to fix a higher value by providing a seemingly "hard" number of $27.64 per square foot—much closer to the found value of the Elementis property ($29) than the actual $21 price, which was the only figure properly drawn from the Ikea contract.

Likewise the evidence concerning the Agency's plans for the condemned property contributed significantly to the overall likelihood that the jury fixed a higher value than it would have allowed in the absence of the errors. In jury argument counsel accused the Agency of using the condemnation of the Elementis property case as a "cost recovery vehicle . . . to *subsidize its shopping center*." He later returned to this point: "At the end of the day, they're trying to undercompensate this property owner in order to *subsidize their property*, pure and simple, and it's an end-justifies-the-means mentality which ignores the rights of the property owner, which are the only thing at issue here. The question isn't whether or not *they get to build their shopping center* on that property. The question is should we get paid the fair market value." (Italics added.) Elsewhere counsel cited the intended use to trivialize the Agency's decontamination efforts, referring to "the remediation efforts that the City wanted to pursue for its shopping center . . . ." Similarly counsel mocked an offer to purchase the property as "essentially" saying, " 'Do our demolition, indemnify us, if there's any *cost overruns in our shopping center project*, that's your responsibility.' " (Italics added.)

In sum, the improperly admitted evidence had a natural tendency to adversely affect the verdict in a number of respects. Evidence of Agency purchases provided the foundation for raising the issue of a "gift of public funds," and for all but compelling an inference that the price paid for those properties was no higher than their market value. The Agency's own failure to rely on those purchases raised an appearance that it was attempting to hide relevant evidence. Those purchases also provided the sole basis for the inflammatory suggestion that Elementis was the victim of unwholesome

---

[8]A foundational objection to the last-quoted testimony was sustained in midanswer, but it is impossible to tell what portion of the answer was deemed objectionable, and no part of it was stricken.

discrimination which the jury ought to remedy with a generous award. Evidence of the "allocation" of the Ikea purchase price provided an inflated starting point for the comparison of that purchase to the hypothetical sale of the Elementis property. And the evidence of the Agency's intended plans for the Elementis property provided a foundation for trivializing the Agency's performance of its function and the very substantial hurdles it faced in preparing the subject property for redevelopment. At least in combination, these effects were prejudicial, requiring reversal for a new trial.

## V.

### *Fixtures and Equipment*

Plaintiff contends that the trial court erred by permitting Elementis to seek compensation of $1,657,148 for fixtures and equipment situated on the condemned property at the time of the taking. Elementis contends that the issue was properly submitted to the jury and that plaintiff suffered no prejudice because the jury only awarded $466,000. We believe any recovery exceeding the salvage value of the equipment violated the principle of "consistent use," which was not rendered inapplicable by defendant's claim of a compensable "interim use."

Where condemned property includes fixtures or other improvements, they must be "taken into account in determining compensation." (Code Civ. Proc., § 1263.210, subd. (a) (section 1263.210(a)).) "Taken into account," however, does not mean—as defendant's selective quotation would suggest—that improvements must always be "paid for by the condemnor." (Legis. Com. com., 19A West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1263.205, p. 24.) Rather, under section 1263.210(a), "[i]f the improvements serve to enhance the value of the property over its unimproved condition, the property receives the enhanced value; if the improvements serve to decrease the value of the property below its unimproved condition, the property suffers the decreased value." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc., *supra*, foll. § 1263.210, p. 26.)

Although we know of no case so stating, we have little doubt that California law incorporates the principle of "consistent use," i.e., "that land cannot be valued based on one use while improvements are valued based on another." (Appraisal Institute, The Appraisal of Real Estate (12th ed. 2001), p. 324; see *Spano v. State of New York* (1964) 22 A.D.2d 757 [253 N.Y.S.2d 730] ["It was error . . . to award anything for the value of the buildings while at the same time fixing the land value for commercial usage since the two bases are entirely inconsistent"].) Thus a landowner cannot

recover compensation based on a use more valuable than the existing one while simultaneously claiming recovery under section 1263.210(a) for existing improvements that are incompatible with that use. This principle would seem inherent in the Law Review Commission's recognition that improvements can "decrease the value of the property below its unimproved condition." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc., *supra*, foll § 1263.210, p. 26; see also 1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 2d ed. through June 2002 update) § 4.18, p. 109 ["Often, when property is ready for immediate development, the presence of older improvements may actually reduce the property's value because of the cost of removal."]; 2 Smith et al., Cal. Civil Practice Real Property Litigation (1994) § 15:92, p. 115.)[9]

Elementis does not dispute the soundness of this general principle, nor that its factual premise was established here, i.e., the fixtures for which defendant sought compensation were incompatible with the highest and best use on which both parties predicated their appraisals of the property. As defense expert Clevenger conceded, the property could not "be developed for its highest and best use with the equipment in place." However, Elementis contends that the rule of consistent use does not bar recovery for the fixtures and equipment here because the existing use could have continued *temporarily* until the property was ready for development. This prospect of "interim use," Elementis contends, enhanced the overall value of the property. For this proposition defendant quotes another section of the same text on which plaintiff relies: "The use to which a site or improved property is put until it is ready for its highest and best use is called an *interim use*. Thus, interim use is a *current highest and best use* that is likely to change in a *relatively short time—say, five to seven years*."[10] (Appraisal Institute, The Appraisal of Real Estate, *supra*, pp. 323-324, first italics in original.)

Elementis's claim for the "interim use" value of the fixtures and equipment runs afoul of the basic proposition that "in eminent domain actions,

[9]"For example, a property may be improved with a single-family residence, but the highest and best use of the land may be commercial. In order to realize the value of the commercial land, the residence will have to be removed. Unless the residence has some salvage value, the cost of demolition and removal must be offset against the value of the land without any improvements to arrive at the proper valuation." (2 Smith et al., Cal. Civil Practice Real Property Litigation, *supra*, § 15:92, p. 115.)

[10]The Elementis appraisers were somewhat vague with respect to the claimed duration of any "interim use," but did not suggest more than three years. Clevenger referred to a period of "two or three years." Defense expert Gimmy testified, "[Y]ou have to get entitlements and get the property clean . . . . And that process generally takes *one, two or three years at the most*. There's *examples* of projects in the area taking *up to around two years or so* before they're off the ground after the land is purchased."

'elements affecting value which, while possible, are not reasonably probable, should be excluded.'" (*Humphries Investments, Inc. v. Walsh* (1988) 202 Cal.App.3d 766, 772 [248 Cal.Rptr. 800], quoting *People v. Ocean Shore Railroad* (1948) 32 Cal.2d 406, 426 [196 P.2d 570, 6 A.L.R.2d 1179]; *State of Cal. ex rel. State Pub. Wks. Bd. v. Wherity* (1969) 275 Cal.App.2d 241, 246 [79 Cal.Rptr. 591].) Thus, in order to justify a finding in Elementis's favor—or submission of the issue to the jury—there must be substantial evidence that a period of interim use was not only possible, but probable— probable enough, at any rate, to support an inference that a hypothetical buyer and seller on November 1, 1998, would have added something to the price to reflect this supposed value. Neither the evidence of record nor any offer of proof or argument of counsel contains a sufficient basis for such a finding.

A finding of compensable "interim use" will ordinarily require *concrete evidence* of circumstances that could reasonably cause a buyer of the *particular property at issue* to view the presence of incompatible improvements as a net economic benefit rather than a net cost. The facts on which Elementis relied did not approach such a showing. Elementis never identified any concrete physical, legal, or economic obstacle, or other particular cause, that would have been reasonably likely to prevent or deter a developer from entering the property on the day title transferred and commencing the physical process of development. At most, defense counsel and witnesses offered generic assertions that the property's transition to its highest and best use *could* be delayed by demolition and remediation and by routine steps in development such as planning the project, obtaining "entitlements" (i.e., permits), and financing. Thus when defense expert Gimmy was asked "how would one go about" continuing the existing use while "still pursu[ing] a shopping center," he replied, "[Y]ou have to get entitlements and get the property clean." But in the absence of some showing to the contrary, "getting the property clean" would be *incompatible* with the continued presence of existing improvements. As for "entitlements," defendant made *no attempt* to show the actual duration or likelihood of any regulatory delay that might reasonably be expected to attend a development of this kind. Gimmy's testimony only established a *maximum* delay of three years, with an equally possible *minimum* delay of *one* year, or perhaps less. (See fn. 10, *ante.*) Defense expert Clevenger testified that "[i]n a normal course of events, a developer would buy the property and take *two, three years to make the plans*, get his plans in shape, to *get them approved*" (italics added), but he said nothing about why (or for how long) such a developer would delay in entering and clearing the property in order to be ready to carry those plans into effect. Indeed he never explicitly linked these generic periods of delay

to the "interim use" claim. His testimony elsewhere cast serious doubt on the substance of that claim by seeming to contemplate a period of interim use intended, at least in part, as an *accommodation to the seller*, i.e., to permit the orderly shutdown of the existing operation. Nothing in this record supports a belief that such a factor is something for which *the buyer* would be reasonably likely to pay $1.6 million, or $466,000, or any amount.

Moreover, apart from the ultimate conclusion that a buyer would contemplate a period of interim use, Clevenger like Gimmy failed to identify any reasonably probable *reason* for the buyer of *this* property to do so. Indeed none of his testimony asserted that a buyer would be *likely* to do so; instead he spoke in terms of mere possibility.

Defense counsel argued to both the court and the jury that a finding of "interim use" was supported by various periods of time *preceding* the valuation date. These arguments appear facially unsound, if only because during the cited periods the property was not in the possession of anyone with the power and inclination to undertake immediate development. It would seem far more telling that as soon as the Agency acquired the right to possession, it set about the demolition and removal of all improvements and the radical remediation of the soil, such that by the time of trial the property was apparently almost clean and ready for construction. It is conceivable that some obstacle would have prevented a hypothetical purchaser from proceeding with similar alacrity, but we are directed to no *evidence* to that effect, and our review of the record has discovered none.

We conclude that the vague generalities offered by defendant's experts did not constitute substantial evidence on which to predicate a finding that it was *reasonably probable* that the prospect of such use would have enhanced, rather than diminished, the value of the land in the eyes of the hypothetical buyer and seller.

We note other dubieties in the claim for interim use. As defendant's equipment appraiser freely admitted, the figure he gave for the fixtures, and which was adopted in the appraisals of the property as a whole, was predicated on the supposed value of the fixtures "in place, in use"—the same measure that would have applied if the "interim" operation were expected to continue *for the life of the fixtures*.[11] Gimmy justified his adoption of this figure only by stating that in his opinion, the equipment appraiser's "average

---

[11]"[Y]our in-place/in-use value assumed the continued utilization of the equipment on an ongoing basis on subject property. [¶] A. That is part of the definition of fair market value in place in use, and yes, I did. [¶] Q. *You never valued it, for example, the equipment for say an*

depreciation of 80 percent represented the actual value of *that property* and *its remaining usability*." (Italics added.) But the "interim value" of the fixtures to the buyer of the property would be a reflection not of their "remaining life" as fixtures, but of their remaining usefulness as a source of income *from the underlying real property*. We see no evidence from which the jury could have derived this latter value. It is therefore no answer to plaintiff's objection to say that the jury reduced defendant's claim by nearly three-quarters. There was no basis in this record for the jury to calculate *any* "interim use" value for the fixtures and equipment. On the evidence submitted, the verdict necessarily rested on sheer guesswork.

If defendant's approach to "interim use" were sustained, such a claim could apparently be submitted in *every case* where property with existing business-related improvements is taken for redevelopment to a higher and better use. After eliciting generalizations from its experts about possible delays in development, a landowner could recover the value of the real estate at a higher and better use than the one he has made, while adding in a claim for fixtures and improvements which are incompatible with that use.

 At its core the concept of interim use is intended for situations where property is *in the process of transition* from a less valuable to a more valuable use, e.g., from agricultural to residential development. The property is worth more because of its *future* use, but market forces may not yet have reached the point where it is economical to make the transition. The property is essentially held as an *investment* for eventual development to the higher use. During this period the continuation of the past, soon-to-be-displaced use is valuable for helping to defray the carrying costs that would otherwise be incurred by the buyer. (See Matteoni & Veit, Condemnation Practice in Cal., *supra*, § 4.18, p. 106 ["Although the highest and best use may be reasonably near, development to that use may not be immediate."]; *id.* at p. 107, ["Income generated by property that is in a *state of transition* to a higher use is sometimes referred to as *carrying value* because it permits a developer to pay his *holding costs* (e.g., taxes, purchase loan, interest) during the interim period" (italics added)]; *In re Mocco* (Bankr. D.N.J. 1998) 222 B.R. 440, 457-458 [under New Jersey law, "interim use" means period during which property destined for higher use is "h[e]ld for future development" until "demolition and re-development is economically feasible" (italics added)]; *Woods v. State* (1971) 36 A.D.2d 572 [317 N.Y.S.2d 782, 783] [where

interim use of, say, two years. [¶] A. *No*. The issue of an interim use is a real estate issue and is not relevant to what my job description is nor to the appraisal of the personal property." (Italics added.)

"The job description that was given to me was to do two values: Price of cost new and fair market value in place in use."

condemned acreage was surrounded by developed land and was served by utilities, agricultural use on which condemner's expert based valuation was "properly rejected by the court except as an interim use"]; *Pascack Motel, Inc. v. State* (1972) 40 A.D.2d 919, 920 [338 N.Y.S.2d 204, 206] [award for interim use allowed, though reduced to reflect "income approach," where appraisers agreed that highest and best use was "*future* development as a shopping center or modern high rise motel" (italics added)].)[12] This policy would not be served by permitting a landowner to assert a claim for "interim use" based on the mere suggestion that development to a higher and better use *might* or "could" be delayed by routine steps in the development process, without a concrete showing that the delay would probably appear, to a hypothetical buyer and seller, sufficiently likely and lengthy to support a price enhancement based on "interim use."

Defendant also asserts that an award for fixtures and equipment was authorized by *Redevelopment Agency v. First Christian Church* (1983) 140 Cal.App.3d 690 [189 Cal.Rptr. 749] and *City of Los Angeles v. Hughes* (1927) 202 Cal. 731 [262 P. 737]. Neither of these cases has any discernible relevance to the issues before us. Nor do we perceive any inequity in rejecting defendant's claim for the supposed value of fixtures. Defendant received compensation in the form of a valuation predicated on higher and better use than it had ever seen fit to make of the property. It was not entirely deprived of the value of the fixtures; only of their value to a use which would inevitably be discontinued because it was incompatible with the property's economic destiny. Plaintiff's demolition contractor testified that he received about $30,000 in salvage for electrical equipment, which was the only salvageable equipment on the site, and about $138,000 for "scrap material," the exact origins of which are unclear. On this record, this was all the value the improvements possessed, and all the value defendant was entitled to claim.

## VI.

### Goodwill

In its cross-appeal, Elementis contends that the trial court erred by refusing to permit it to present evidence of, and seek an award for, loss of

---

[12]The point is also made in the latest edition of the appraisers' text on which both parties have relied here: "In many instances, a property's highest and best use may change in the foreseeable future. For example, the highest and best use of a farm in the path of urban growth could be for interim use as a farm, with a future highest and best use as a commercial subdivision . . . . *If the land is ripe for development at the time of the appraisal, there is no interim use.*" (Appraisal Institute, The Appraisal of Real Estate, *supra,* p. 307, italics added; see *id.* at p. 310 ["In some cases an appraiser may conclude that the highest and best use of a parcel is to *hold the land for investment purposes*—i.e., to remain vacant or *to be employed in some interim use until development is justified by market demand*" (italics added)].)

goodwill. Elementis contends it presented evidence from which the jury could have found that it sustained such losses. In response the Agency asks us to adopt a rule under which the trial court determines threshold issues governing the *entitlement* to goodwill, and only if it finds those conditions present, submits to the jury questions of *amount*. The Agency further argues that whether or not we prescribe such a rule, the trial court acted properly in excluding the claim for goodwill. We hold that the trial court properly withheld this element of compensation from the jury.

Prior to the enactment of Code of Civil Procedure section 1263.510, subdivision (a) (section1263.510(a)), loss of goodwill was not recoverable in eminent domain proceedings. (*Chhour v. Community Redevelopment Agency* (1996) 46 Cal.App.4th 273, 278 [53 Cal.Rptr.2d 585]; *Community Development Com. v. Asaro* (1989) 212 Cal.App.3d 1297, 1301-1302 [261 Cal.Rptr. 231].) The statute changed that rule to allow recovery, provided that the property owner demonstrates the presence of four threshold conditions, including that "[t]he loss is caused by the taking of the property or the injury to the remainder" (§ 1263.510(a)(1)) and that "[c]ompensation for the loss will not be duplicated in the compensation otherwise awarded to the owner" (§ 1263.510(a)(4)). The court below concluded that defendant's claim satisfied neither of these requirements, i.e., that any loss of goodwill was caused not by the taking, but by the property's transition to a higher use, and that to allow recovery for loss of goodwill would duplicate the valuation of the property for such higher use.

The first question is whether the trial court properly determined defendant's entitlement to goodwill rather than submitting that issue to the jury. The question arises because the general rule in eminent domain actions is that " '[t]he right to a jury trial . . . goes *only* to the *amount* of compensation.' " (*Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 80 [185 Cal.Rptr. 159]; see Cal. Const., art. I, § 19; *People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799] (*Ricciardi*).) "All other questions of fact, or mixed fact and law, are to be tried . . . without reference to a jury." (*Ricciardi*, at p. 402; see *Pacific Gas & E. Co. v. Peterson* (1969) 270 Cal.App.2d 434, 438 [75 Cal.Rptr. 673] ["the issue of the defendant's damages" goes to the jury, and "all other issues of law *or fact* must be decided by the court" (italics added)].)

Consistent with this rule, the court, rather than the jury, typically decides questions concerning the preconditions to recovery of a particular type of compensation, even if the determination turns on contested issues of fact. Perhaps most analogous for present purposes is the rule applicable to claims

for "severance damages," i.e., harm caused to the landowner's remaining property when only a part of the property is condemned. (*City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 741 [25 Cal.Rptr.2d 480, 863 P.2d 725].) As codified in Code of Civil Procedure section 1263.410, subdivision (a), the right to such damages is conditioned on a determination that "the property taken is part of a larger parcel." The determination whether this condition is present in a particular case is entrusted to the trial court. (*Neumann, supra,* 6 Cal.4th at p. 745; *People ex rel. Dept. Pub. Wks. v. L. A. County Flood etc. Dist.* (1967) 254 Cal.App.2d 470, 477 [62 Cal.Rptr. 287]; *City of Stockton v. Marengo* (1934) 137 Cal.App. 760, 765 [31 P.2d 467].) Although the question has often been described as one of "law" (see *Neumann, supra,* 6 Cal.4th at p. 745; *People ex rel. Dept. Pub. Wks. v. L. A. County Flood etc. Dist., supra,* 254 Cal.App.2d at p. 477; cf. *Marengo, supra,* 137 Cal.App. at p. 765 ["essentially a question of law"]), it is decided by the court even if it involves issues of fact (see *People ex rel. Dept. Pub. Wks. v. Nyrin* (1967) 256 Cal.App.2d 288, 292 [63 Cal.Rptr. 905] ["What constitutes a single parcel of land in the contemplation of section 1248 is essentially a question of law [citation] but may involve issues of fact. [Citations.] . . . . Insofar as the evidence is subject to opposing inferences, it must upon a review thereof, be regarded in the light most favorable to the ruling of the trial court."]; *People ex rel. Dept. Pub. Wks. v. International Tel. & Tel. Corp.* (1972) 22 Cal.App.3d 829, 833-834 [99 Cal.Rptr. 836] [trial court ruled "as matter of law" that property taken and property remaining did not possess "unity of use"; reviewing court found "ample evidence to support the court's findings of fact with regard to the use of the property"]). The same is true of at least some other issues touching on the threshold entitlement to severance damages. Thus, where a landowner seeks compensation for impairment of access to a remaining easement, "the question of whether access rights are impaired is a question for the court." (*People ex rel. Dept. Pub. Wks. v. L. A. County Flood etc. Dist., supra,* 254 Cal.App.2d at p. 477; *Ricciardi, supra,* 23 Cal.2d at pp. 402-403; see *Pacific Gas & E. Co. v. Peterson, supra,* 270 Cal.App.2d 434 at pp. 437-438 [after finding on substantial evidence that landowner had no prescriptive avigation easement over neighbor's fields, trial court properly withheld claim from jury].)

 Apparently seeking to counterbalance this weighty body of authority, defendant cites *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 718 [66 Cal.Rptr.2d 630, 941 P.2d 809], for the proposition that "the question of whether a property owner is *entitled* to compensation for severance damages presents a question of fact for the jury." (Defendant's italics.) An examination of that opinion reveals that it involved no issue of threshold "entitlement" as considered here and in the cases cited above. Rather it was solely

concerned with the correct *measure* of damages—in particular, the extent to which the condemnor was entitled to a *setoff* against severance damages based on evidence that the taking would ultimately enhance the value of the remaining property. (See *id.* at p. 702 et seq.) It was in this context that the court issued its holding, a fragment of which is quoted by defendant: "We hold that in determining a landowner's *entitlement to severance damages,* the fact finder henceforth shall consider competent evidence relevant to any conditions caused by the project that affect the remainder property's fair market value, insofar as such evidence is neither conjectural nor speculative." (*Id.* at p. 718, italics added.) It is clear that this use of the term "entitlement" was less than precise, and that the only issue actually considered was the *amount* of severance damages when the statutory conditions for recovery are present.

Similarly, Elementis cites a number of decisions in which, it asserts, the issue of entitlement to lost goodwill was submitted to the jury. (*Redevelopment Agency v. Thrifty Oil Co.* (1992) 4 Cal.App.4th 469 [5 Cal.Rptr.2d 687] (*Thrifty Oil*); *People ex rel. Dept. of Transportation v. Salami* (1991) 2 Cal.App.4th 37 [2 Cal.Rptr.2d 833] (*Salami*); *People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263 [203 Cal.Rptr. 772, 681 P.2d 1340]; *Redevelopment Agency v. Arvey Corp.* (1992) 3 Cal.App.4th 1357, 1364-1365 [5 Cal.Rptr.2d 161].) None of these cases addressed, or even acknowledged the existence of, the issue before us. In *Thrifty Oil, supra,* 4 Cal.App.4th at pages 476-477, the closest question addressed was whether the evidence at trial required a larger award than was made by the jury. The particular sentence quoted by defendant alludes in passing to "entitlement," but is not even *dictum* on the point in question because no question was raised or acknowledged as to whether the jury should decide that issue. (*Id.* at p. 476.)[13] In *Salami, supra,* 2 Cal.App.4th at pages 40-41, 45-46, the parties *stipulated* that the statutory conditions for recovery of goodwill were present; the question on appeal was whether the trial court erroneously placed upon the landowner the burden of proving the *amount* of goodwill lost. In *Muller, supra,* 36 Cal.3d at pages 269-271, the only question considered was whether loss of excess income was a form (or

---

[13]The basic points of dispute in *Thrifty Oil* appeared to be (1) whether the defendant possessed any goodwill in the business, and (2) whether the method used to calculate it duplicated the method used to calculate the value of the land. (See *Thrifty Oil, supra,* 4 Cal.App.4th at pp. 475-476.) The opinion does not clearly indicate who decided these questions. Logically, a finding that the defendant had no goodwill to lose would preclude a finding of the four statutory preconditions to recovery, and if such a finding were supported by substantial evidence it would presumably justify withholding the issue from the jury. We need not address this point, however; nor need we consider the extent to which issues decided in the landowner's favor on the questions of entitlement may be resubmitted to the jury in the hope of obtaining a contrary determination.

proper measure) of "goodwill" under section 1263.510. And in *Arvey, supra,* 3 Cal.App.4th at pages 1364-1365, the question was how to treat elements of goodwill that were compensable under the Relocation Assistance Act (Gov. Code, § 7260 et seq.). We again note that cases are not authority on points they do not consider. (*City of Oakland v. Public Employees' Retirement System, supra,* 95 Cal.App.4th at p. 57.)

Elementis also notes that BAJI No. 11.91 contemplates submission to the jury of the issue of entitlement to goodwill, and that the instruction was cited approvingly in *Thrifty Oil, supra,* 4 Cal.App.4th at page 478, and *Redevelopment Agency v. Metropolitan Theatres Corp.* (1989) 215 Cal.App.3d 808, 810 [263 Cal.Rptr. 637]. But again, neither of those cases presented any issue of whether the instruction accurately reflected the law. The latter case, like *Salami, supra,* 2 Cal.App.4th 37, concerned the allocation of the burden of proof on the question of the *amount* of lost goodwill. (*Redevelopment Agency v. Metropolitan Theatres Corp., supra,* 215 Cal.App.3d at p. 811.)

Given that the conditions in section 1263.510(a) go to the entitlement to recover a *type* of compensation, we see no reason to treat them differently from the preconditions for the recovery of severance damages. We therefore hold that where the presence of these conditions is disputed, the determination of that dispute, including the resolution of any disputed factual issues, is for the trial court. Only upon proving to the court's satisfaction that the statutory conditions are satisfied may the landowner present evidence of lost goodwill to the jury.

Here no error appears in the trial court's determination that the statutory conditions were not present. Section 1263.510(a)(1) requires a finding that the claimed loss of goodwill was "caused by the taking of the property." Plaintiff contended below, and the trial court found, that any loss of goodwill here was caused not by the taking but by the inevitable transition of the property to the higher and better use to which both sides agreed it was destined, and with which the continued operation of defendant's business was incompatible. The court also found that since the defendant was being compensated for the land at a value predicated on this higher and better use, rather than at a lower value consistent with continued operation of its business, any award of goodwill would be incompatible with the property valuation, would amount to a windfall, and would duplicate "compensation otherwise awarded to the owner." (§ 1263.510(a)(4).)

Defendant does not comprehensibly dispute the general soundness of this reasoning but asserts that it was inapplicable here because there was evidence to the effect that in a private sale, the business would have continued

for some unspecified period as an "interim use" of the property while defendant made an orderly transition to its new location. No authority is offered for this theory, which we have already rejected in another context. (See pt., V., *ante*.) We also note that any such negotiated temporary extension would seem to constitute an accommodation to the seller, which would presumably be reflected in some corresponding shift of values in favor of the buyer. Since defendant's appraisers made no attempt to include any such adjustment in their valuation of the property, we agree with plaintiff and the trial court that allowance of the goodwill claim, even if otherwise sound, would on its face have effected a windfall incompatible with defendant's theory of value.

No error appears in the denial of damages for lost goodwill.

VII.

*Assessment Lien*

■ Defendant's second contention on cross-appeal is that the trial court erred by deducting $332,228 from the verdict on account of an unpaid special assessment lien. Defendant's argument on this point is without merit. It rests largely on the fact that the Agency failed to join the City, as lienholder, in this action. This was undoubtedly a failure to comply with Code of Civil Procedure section 1250.250, subdivision (b), which provides that "[t]he holder of a lien that secures a special assessment or a bond representing the special assessment shall be named as a defendant, regardless of the nature of the special assessment and the manner of collection of the special assessment." It hardly follows from this mandate, however, that if the lienholder is not joined in the action, the balance of the lien goes *to the landowner*. Such a result would violate a clear statutory mandate, as well as basic principles of logic and fairness.

Code of Civil Procedure section 1265.250, subdivision (b) (section 1265.250(b)), provides, "If property acquired by eminent domain is encumbered by the lien of a fixed lien special assessment or of a bond representing the fixed lien special assessment. [¶] (1) *The amount of the lien shall be paid to the lienholder from the award or withheld from the award for payment* pursuant to Section 1265.220." (Italics added.) Code of Civil Procedure section 1265.220 provides, "Where property acquired by eminent domain is encumbered by a lien and the indebtedness secured thereby is not due at the time of the entry of judgment, *the amount of such*

*indebtedness may be, at the option of the plaintiff, deducted from the judgment and the lien shall be continued until such indebtedness is paid;* but the amount for which, as between the plaintiff and the defendant, the plaintiff is liable under Article 5 (commencing with Section 1268.410) of Chapter 11 may not be deducted from the judgment."[14] (Italics added.)

Defendant's only comment on section 1265.250(b) is that it cannot "preempt" the requirement of Code of Civil Procedure section 1250.250, subdivision (b) that the lienholder be joined as a party. Of course there is no issue of "preemption." Nor is there a statutory conflict or ambiguity on which to predicate an exercise in interpretation. Code of Civil Procedure section 1250.250 requires joinder of the lienholder, but it does not remotely suggest that noncompliance is penalized by requiring the condemner to pay the condemnee a windfall. Rather, the effect of noncompliance is that the condemnor takes the property subject to the lien. (Cal. Law Revision Com. com., 1980 Amendment, 19 West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1250.50, p. 647 [failure to join lienholder "leaves the lien unimpaired"].) Since the condemner or its transferee must thus eventually pay the lien (or suffer its satisfaction by foreclosure), it would be irrational to require that the condemner also pay the balance of the lien to the condemnee. This would amount to the imposition of a forfeiture on the public fisc with no discernible basis in statutory language, legal principle, or policy.

If Elementis is concerned about the nonjoinder of the lienholder, it is free to seek appropriate relief based on that fact. (See Code Civ. Proc., § 389 [joinder of indispensable parties].) We also observe that on remand, the Agency may seek to remedy its noncompliance with Code of Civil Procedure section 1250.250, subdivision (b) and that upon its failure to do so, the trial court may be empowered to craft appropriate relief on its own motion, if necessary to effect complete justice.

## VIII.

### *Archaeological Mitigation*

The Agency contends that the trial court erred by allowing Elementis to challenge the measures adopted by the Agency to mitigate damage to the archaeological resources on the property, which consist of a Native

---

[14]The final clause concerns the proration of property taxes as between condemner and condemnee. (See Code Civ. Proc., § 1268.410, citing Rev. & Tax. Code, § 5082.)

American shellmound and human remains. The Agency contends that these measures cannot be challenged in this proceeding because they were adopted pursuant to an environmental impact report (EIR) of which Elementis, or any other interested party, could have sought judicial review under CEQA. We find this objection unsound. The question before the jury was not whether the environmental impact report complied with CEQA, but how much the hypothetical buyer and seller would have deducted from the price on November 1, 1998, had they known the facts available at trial. (See *Mireiter*, *supra*, 18 Cal.App.4th 1808, 1812.) Elementis's argument, as we understand it, was that the Agency's treatment of archaeological resources *exceeded* the requirements of CEQA—a point which could well have evaded judicial review had the EIR been challenged. It also seems likely that the Agency itself had the dominant role in formulating the EIR and approving its terms. The Agency's argument could effectively empower it to adopt any measures it chose and then seek de facto reimbursement from a condemnee while withholding from the jury any question whether its expenditures actually reflect what a reasonable buyer and seller would have anticipated.

We recognize that evidence of this kind poses an obvious risk of consuming excessive time and judicial resources. The remedy for that risk must be sought in such provisions as Evidence Code section 352.

IX.

*Other Issues*

The Agency contends that the trial court abused its discretion by refusing to assign this case to a single judge for all purposes. While we believe that the size and complexity of this case make it a suitable candidate for such treatment, we cannot say that the trial court abused its discretion in concluding otherwise.

In case Nos. A091716 and A093126 the Agency contends that the trial court erred by awarding attorney fees and costs to Elementis. The Agency concedes that reversal of the judgment renders these issues moot. Since they are unlikely to recur in exactly the same way on remand, no purpose would be served by further analysis.

Also moot is the Agency's contention that the trial court erred by excluding evidence of the Agency's expenditures in "remediating" the contaminated soil on the subject property, and by staying a portion of the judgment

pending disposition of a federal action by the Agency to recover such costs from Elementis and others. We are far from satisfied that this objection was preserved for appeal, but in any event it cannot arise in the same form on remand because, as the parties have apprised us, they have reached a settlement in the federal lawsuit on which the trial court's ruling was predicated. The effect of this settlement and other posttrial events on the determination of just compensation appears to depend, at least potentially, on extrinsic evidence as well as legal questions of first impression which have not been tried or briefed. These questions therefore cannot be usefully addressed on this appeal.

## DISPOSITION

In case No. A090932, the judgment is reversed for further proceedings consistent with this opinion. Case Nos. A091716 and A093126 are dismissed as moot.

Kay, P. J., and Reardon, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 13, 2002.